# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

            Plaintiff,                          No. CR 14-922 JB

vs.

JASONN GONZALES,

            Defendants.

## DEFENDANT'S SENTENCING MEMORANDUM

As a child, Jason Gonzales experienced a barrage of trauma and abuse which culminated in his commitment to juvenile psychiatric facilities.  At the age of eighteen, Mr. Gonzales was convicted of a serious violent crime and sentenced to fifteen years in prison.  However, after he was released from custody in 2002, Mr. Gonzales enjoyed a sustained period of rehabilitation: he married, fathered a daughter, maintained steady employment and created a joyous life for himself and his family.  Sadly, this happiness was ultimately shattered by an untreated drug addiction and a gambling obsession which together led Mr. Gonzales to commit wide ranging acts of fraud against the state unemployment agencies of Texas, New Mexico and Colorado.

Mr. Gonzales stands convicted by his plea of guilty, as charged, to the crimes of conspiracy, mail fraud and aggravated identity theft.  Mr. Gonzales is now facing a sentence under section 2B1.1–a section of the United States Sentencing Guidelines which has recently become the subject of repeated criticism and serious re-examination.  Many commentators and stakeholders have condemned this theft and fraud Guideline for being too severe, for containing an overly complex and unworkable definition of the term "loss" and for capturing the same

conduct in multiple, separate enhancements which unreasonably inflate the final sentence.  See,

United States Sentencing Commission, Symposium on Economic Crime, September 18-19,

2013, Transcript of Proceedings, pp. 85-100, reported at www.ussc.gov /research-and-

publications/research-projects-and-surveys/economic-crimes/united-states-sentencing-

commission-symposium-economic-crime.

Mr. Gonzales respectfully submits that a sentence of no more than 81 months in the

custody of the United States Bureau of Prison, followed by a term of supervised release, is

sufficient to account for the nature and circumstance of the present offense, to consider Mr.

Gonzales' tragic life history and his redeemable personal characteristics and to promote respect

for the law and provide a just punishment.[1]  Mr. Gonzales contends that any sentence in excess of

81 months would be unjust, unreasonable and more severe than necessary to achieve the

sentencing aims established by Congress in 18 U.S.C. § 3553.

### Objections to the Pre-Sentence Investigation Report

Mr. Gonzales specifically objects to the following paragraphs in the Pre-Sentence

Investigation Report:

Paragraph 68 – Mr. Gonzales challenges the use of an inchoate, intended loss of

$1,317,411.00 to increase his base offense level by 16 levels.  Instead, Mr. Gonzales argues that

his base offense level should only be increased by 14 levels to account for the actual loss of

---

[1]  Mr. Gonzales has arrived at a final adjusted offense level of 24 for the crimes in Counts I through V of the Indictment by beginning with a base offense level of 7, followed by an increase of 14 levels due to an actual loss of $804,000, plus a 2 level increase for sophisticated means and a 4 level increase for his aggravated role, reduced by 3 levels for his acceptance of responsibility.  A final adjusted offense level of 24 and a criminal history category of II, yields a low-end Guideline sentence of 57 months, combined with a mandatory, consecutive sentence of 24 months for aggravated identity theft, resulting in a sentence of 81 months.

$804,735.73.  In the alternative, Mr. Gonzales contends that if this Honorable Court uses the intended loss to increase his base offense level, then he is entitled to a three-level reduction for an attempted theft, as set out in Section 2X1.1(b) of the Guidelines.

Paragraph 69 – Mr. Gonzales respectfully submits that there were only three victims of his offense, not more than fifty as alleged in Paragraph 69 of the Pre-Sentence Investigation Report.  Application Note 1 to Section 2B1.1 defines a "victim" only as "any person who sustained any part of the *actual loss* determined under section (b)(1)" (emphasis added); therefore there are only three "victims" of the fraud in this case: (1) the Texas Workforce Commission; (2) the Colorado Department of Labor and Employment; and, (3) the New Mexico Department of Workforce Solutions.

Paragraph 70 – Mr. Gonzales objects generally to an enhancement of his sentence for the use of sophisticated means under section 2B1.1[b][10][C] because that fact substantially overlaps with, and is adequately taken into account by, the loss amount in section 2B1.1[b][1][H].

Paragraph 71 – Because Mr. Gonzales faces a mandatory, consecutive sentence of 24 months for the crime of aggravated identity theft as admitted in Count VI of the Indictment, Application Note 2 to section 2B1.6, specifically prohibits the use of "any specific offense characteristic for the transfer, possession or use of a means of identification when determining the sentence for the underlying offense" as suggested in Paragraph 71.  Mr. Gonzales should not be subjected to the two-level increase recommended by this paragraph because the Guidelines specifically recognize that a two-year consecutive sentence fully "accounts for this factor for the underlying offense of conviction."

Paragraph 73 – Mr. Gonzales objects to a four-level enhancement for being an organizer

or leader of criminal activity which involved five or more participants because this enhancement substantially overlaps with, and is adequately taken into account by, the loss amount in section 2B1.1[b][1][H].

Paragraph 134 – Mr. Gonzales respectfully submits that a downward departure based on his Mental and Emotional Condition under section 5H1.3 would be appropriate in this case.

Paragraph 135 – In the same vein, Mr. Gonzales submits that a departure based on his serious addiction to prescription pain medication and his persistent, untreated gambling addiction could together justify a departure under section 5H1.4 because these addictions are present to an unusual degree and substantially contributed to the commission of the charged offense.

Paragraph 136 – Mr. Gonzales contends that, in addition to the factors identified in the Pre-Sentence Investigation Report which could support a departure or a variance, this Honorable Court can depart or vary from the sentence recommended by the United States Sentencing Guidelines in an effort to avoid unwarranted sentencing disparities caused by substantially over-lapping specific offense characteristics which unreasonably aggregate Mr. Gonzales' sentence. Cf. *United States v. Lauersen,* 348 F.3d 329 (2nd Cir. 20-).  In addition, Mr. Gonzales contends that this Honorable Court could depart or vary based on his cooperation with law enforcement officers following the detection of his criminal offense and his post-offense efforts at rehabilitation.

### Statement of Facts

Jasonn Gonzales was born on July 19, 1972, in Van Nuys, California.  Jasonn's parents, George Gonzales and Pamela Dubeau, separated when Jasonn was only two years old.  Jasonn lived with his father for the first year after his parents separated.

As a child Jasonn's relationship with his father was extremely volatile and his childhood was marred by serial acts of trauma and abuse.  At the age of five, Mr. Gonzales was sexually assaulted by a babysitter.  Between the ages of six and sixteen, he would spend summers with his father where he was subjected to unrelenting psychological and emotional abuse and inappropriate parenting.  By the time he was a teenager, Mr. Gonzales had developed a serious emotional disorder characterized by alternating bouts of anger and depression which resulted in his hospitalization in a variety of juvenile mental health treatment centers.

Mr. Gonzales was first committed to an in-patient mental health center in Calabasas, California before his sixteenth birthday and he spent almost eight months in that facility. Following his release, Mr. Gonzales attended Provo Canyon High School in Provo, Utah, a residential boarding school which also provided mental health treatment.  While at Provo Canyon High, Mr. Gonzales was diagnosed with Dysthymic Disorder, Intermittent Explosive Disorder and anxiety.  After graduating from high school, Mr. Gonzales continued with outpatient mental health treatment in Utah.

At the age of eighteen, Mr. Gonzales was convicted of attempted burglary and attempted rape and he was sentenced to fifteen years in prison.  While in prison, Mr. Gonzales took advantage of every opportunity which was offered to him to improve his life.  He regularly participated in counseling programs and he took every college-level course that he could.  In June 2001 Mr. Gonzales earned a bachelor's degree in accounting from Utah State University, just months before he was released on parole from the Utah State Penitentiary.

Mr. Gonzales was paroled on March 12, 2002.  After he left prison, Mr. Gonzales successfully completed sex offender treatment.  He was finally discharged from parole on

-5-

January 16, 2006 without a single violation.

  Since his release on parole Mr. Gonzales has tried to start a new life.  He has maintained steady employment as a bookkeeper and an accountant for a variety of New Mexico businesses, including Shidoni Bronze, Akal Security, Conservation Solutions, J & P Plumbing and the Ohkay Owingeh Housing Authority.  Unfortunately, Mr. Gonzales often found it difficult to keep a job for a prolonged period of time because when most of his employers subsequently learned of his criminal past, he was usually fired.

  Nevertheless, despite the difficulty in maintaining steady employment, Mr. Gonzales continued with his efforts to improve his life.  In December 2005 he met Rhonda Valdez and a year later the two married.  Together the couple have one daughter, Olivia.  Ms. Valdez also has a son, Joshua, and Joshua considers Mr. Gonzales as his father.

  Mr. Gonzales and Ms. Valdez had a good relationship and their family lived happily together for many years.  Both Ms. Valdez and Mr. Gonzales' mother describe Mr. Gonzales as a good father who is devoted to his daughter and who has always been a loving and caring presence in both her life and the life of his step-son.  Sadly, Mr. Gonzales' happy family life was ultimately shattered when Mr. Gonzales developed a drug addiction and a compulsive gambling habit which led him to commit the charged offenses.

  About six years ago, Mr. Gonzales had gained so much weight that he began to experience problems with his feet.  A combination of plantar fascitis and circulatory problems led Mr. Gonzales to develop serious infections in his feet and legs which required multiple hospitalizations.  In order to cope with his chronic pain, a doctor prescribed him codeine.  Sadly, Mr. Gonzales quickly developed an addiction to the medication and this addiction lasted for

more than five years.  At the height of his addiction, Mr. Gonzales was spending as much as $1,500 a week on pain medication.

In addition to his growing drug addiction, Mr. Gonzales also became a compulsive gambler.  Mr. Gonzales would often spend at least $1000 a month at different Northen New Mexico casinos to support his gambling habit.  At the height of his criminal enterprise, Mr. Gonzales spent more than $25,000 a month on gambling.

Like so many addicts before him, the escalation of Mr. Gonzales' drug addiction and his compulsive gambling quickly made his life unmanageable.  To cope with the increasing financial pressures, Mr. Gonzales resorted to an illegal scheme to defraud the state unemployment agencies of Texas, New Mexico and Colorado.

In May 2012 Agents with the Inspector General of United States Department of Labor along with Postal Service Inspectors searched Mr. Gonzales' home and discovered evidence which clearly implicated him in the charged offenses.  However, since that time, Mr. Gonzales has tried his best to fully cooperate with law enforcement officers, to accept responsibility for his crimes and to ameliorate the harm that he caused.  He has freely consented to a search of his computers and the hard drives which were seized from his home, he has cooperated in truthfully disclosing his full involvement to law enforcement officials and he has even debriefed with postal inspectors and state authorities to disclose the flaws in the state unemployment system which made his fraud possible.

Following his arrest, Mr. Gonzales was released by the Honorable Robert H. Scott, United States Magistrate Judge, to the third party custody of his mother.  Since that time Mr. Gonzales has been fully compliant with all of the terms and conditions of his pre-trial release. In

addition, he has sought drug treatment with Presbyterian Medical Services at the Santa Fe

Community Guidance Center.  Finally, even though he and his wife are in the process of

obtaining a divorce, Mr. Gonzales has maintained a loving and caring relationship with his

daughter and his step son.

### *Argument*

"It has been uniform and constant in the federal judicial tradition for the sentencing judge

to consider every convicted person as an individual and every case a unique study in the human

failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*Koon v. United States,* 528 U.S. 81, 113 (1996).  Therefore, a sentence in a criminal case must be

reasonable based an assessment of the statutory factors delineated in 18 U.S.C. § 3553(a),

including the nature of the offense, the history and circumstances of the defendant and the need

for the criminal sentence to avoid unwanted sentencing disparities.  *United States v. Kristl,* 437

F.3d 1050, 1053 (10th Cir. 2006).  To impose a reasonable sentence, a District Court must

consider the factors set forth in 18 U.S.C. section 3553 and select a sentence that is "sufficient,

but not greater than necessary" to fulfill the sentencing goals established by the United States

Congress.  *United States v. Mateo,* 471 F.3d 1162, 1163 (10th Cir. 2006).

Mr. Gonzales respectfully submits that a sentence of no more than 81 months in prison is

sufficient, without being greater than necessary, to reflect the seriousness of the offense, provide

just punishment and promote respect for the law.  Mr. Gonzales contends that a sentence of no

more than 81 months is appropriate under a proper application of the United States Sentencing

Guidelines.  Finally, Mr. Gonzales submits that this Honorable Court would be justified in

departing, or varying, from the sentence recommended by the Guidelines in light of his mental

and emotional condition, his chronic drug and gambling addiction, his post-offense efforts at rehabilitation and his cooperation with law enforcement officials.

I.    **THE RECOMMENDED GUIDELINE SENTENCE, WHICH IS BASED ON FIVE SPECIFIC OFFENSE CHARACTERISTICS THAT WERE NOT ALLEGED IN THE INDICTMENT OR ADMITTED BY MR. GONZALES, VIOLATES THE FIFTH AND SIXTH AMENDMENTS.**

Mr. Gonzales pled guilty, as charged, to a multi-count Indictment which charged him with one count of conspiracy to commit mail fraud (in violation of 18 U.S.C. § 1349), four counts of mail fraud (in violation 18 U.S.C. § 1341) and one count of aggravated identity theft (in violation of 18 U.S.C. §1028A).  (Doc. 2, 48-51.)  If this Honorable Court relies only on the facts alleged in the Indictment and admitted by Mr. Gonzales (namely the charged offense and the actual loss), the final adjusted offense level would be 18 and the criminal history category will be II, yielding a recommended Guideline sentence of 30 to 37 months followed by a mandatory, consecutive sentence of 24 months for a total sentence of 54 to 61 months.  However the Pre-sentence Investigation Reports recommends a sentence of 159 to 192 months based on a myriad of inapplicable sentencing factors which were never alleged in the Indictment or admitted by Mr. Gonzales.  Mr. Gonzales respectfully submits that the imposition of such a dramatically increased sentence would clearly violate the Fifth and Sixth Amendments.

The Sixth Amendment provides that those accused of a crime have the right to a trial by an impartial jury.  That right, in conjunction with the Due Process Clause, requires that each element of a crime be alleged in an Indictment and proved to a jury beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364 (1970).  Consequently, "any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a

reasonable doubt." *Alleyne v. United States,* 570 U.S. —, 133 S.Ct. 2151, 2155 (2013).

"The fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors or Mary Jane, must be found by the jury beyond a reasonable doubt." *Ring v. Arizona,* 536 U.S. 584, 610 (2002) (Scalia, J., conc.). Consequently, although the holding in *Alleyne* is limited to those facts which increase the statutory minimum and maximum punishments, Mr. Gonzales nevertheless submits that the reasoning should apply with equal force to <u>any</u> fact which dramatically raises the penalty for a crime based on facts which were not alleged in the Indictment, admitted by the Defendant or proved to a jury beyond a reasonable doubt.

Constitutional error occurs when the court "relies upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily." *United States v. Lander,* 409 F.3d 1254, 1267 (10th Cir. 2005). A growing minority of the members of the United States Supreme Court have now come to recognize that a sentence can become substantively unreasonable any time the sentence is based on judge-found facts which violate the Fifth and Sixth Amendments. *Jones v. United States,* — U.S. —; 2014 WL 1831837 *1 (2014) (Scalia, J. dissenting from the denial of certiorari). These judges have condemned "the unbroken string of cases disregarding the Sixth Amendment" and taken issue with the obviously incorrect notion that "all sentences below the statutory maximum are substantively reasonable." *Id.* at *2

Even if a court does not mandatorily increase a sentence based on judge-found facts, other circuits have recognized that constitutional error may occur if a judge-found fact is determined only by a preponderance of the evidence. *United States v. Staten,* 466 F.3d 708, 717

(9th Cir. 2006).  Thus, "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the conviction, the government must prove such a factor by clear and convincing evidence." *Ibid, see also United States v. Olsen,* 519 F.3d 1096 (9th Cir. 2008); *United States v. Kikumura,* 918 F.2d 1084, 1100-01 (3rd Cir. 1990) [a Guidelines enhancement that exponentially increases the recommended sentence "functions as 'a tail which wags the dog of the substantive offense.'"].  Although the Tenth Circuit has not expressly decided this important question, the Court has nonetheless "left open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount." *United States v. Ray,* 704 F.3d 1307, 1314 (10th Cir. 2013), citing *United States v. Olsen,* 519 F.3d 1096, 1105 (10th Cir. 2008).

The Pre-Sentence Investigation Reports recommends <u>tripling</u> the sentence recommended by the Guidelines based on the facts alleged in the Indictment on the basis of a variety of "judge-found" facts which were not alleged in the Indictment or admitted by Mr. Gonzales.  This exercise in judicial fact finding inexorably increases Mr. Gonzales's sentence as surely as the facts found by the judge in *Alleyne,* in violation of the Fifth and Sixth Amendment.  Therefore, Mr. Gonzales respectfully submits that the Constitution forbids this Honorable Court from using these uncharged facts and unproven misconduct to increase his sentence, especially if the Court finds these facts based on a preponderance of the evidence.

## II.     THE SPECIFIC OFFENSE CHARACTERISTICS SET OUT IN THE PRE-SENTENCE INVESTIGATION REPORT ARE INAPPLICABLE OR SUBSTANTIALLY OVER LAP.

The United States Sentencing Commission has recently begun to re-evaluate the

sentences for offenders sentenced under section 2B1.1 of the Guidelines.  See, U.S. Sentencing
Commission, Symposium on Economic Crime, September 18-19, 2013.  This re-evaluation was
primarily motivated by the fact that in 2012 only fifty percent of the defendants sentenced under
section 2B1.1 of the Guidelines received a sentence within the recommended Guideline range.
The increasing distance between Guideline sentences and non-Guideline sentences "is telling us
something about the Guidelines themselves" and suggests that the Guidelines might need to be
adjusted because they can over-estimate the seriousness of the defendant's wrongful conduct.
Hon. Charles R. Breyer, Sentencing Symposium 9/18/13, Tx., pp. 47-48.

    Mr. Gonzales respectfully submits that he should be sentenced only for the actual loss
suffered by the three state unemployment agencies and that his sentence should not be enhanced
by any additional specific offense characteristics.  Mr. Gonzales contends that any effort to
enhance his offense level with the additional specific offense characteristics set out in the Pre-
Sentence Investigation Report is either expressly prohibited by the plain terms of the Guidelines
or is more severe than necessary to account for the nature and circumstances of the charged
crimes.

### A.    Mr. Gonzales' Should Only Be Sentenced Based on the Actual Loss.

    In general a District Court may increase the offense level for a defendant convicted of
fraud based on the actual financial loss caused by the defendant's wrongful conduct or by the loss
intended by the defendant, whichever is greater.  *United States v. Galloway,* 509 F.3d 1246, (10th
Cir. 2007).  Application Note 3(A) of section 2B1.1(b)(1) provides that if an intended loss can be
determined and it exceeds the actual loss, the court should use the intended loss to calculate the
defendant's offense level.  Cf. *United States v. Manatau,* 647 F.3d 148, 1049 (10th Cir. 2011), *see*

*also United States v. Nichols,* 229 F.3d 975, 979 (10th Cir. 2000.)  The reason the intended loss figure is used, even if it is significantly greater than actual loss, is to measure the magnitude of the crime at the time it was committed.  *United States v. Janusz,* 135 F.3d 1319, 1324 (10th Cir. 1998).

Nonetheless, Mr. Gonzales respectfully submits that any effort to punish him for an inchoate, unrealized loss is inconsistent with other, competing sections of the Guidelines.  He respectfully submits that the Guidelines do not contain a workable, internally consistent definition of the term "loss," particularly when a court employs the intended loss as the measure of harm instead of the actual loss.

First, Section 2X1.1(b)(1) and (b)(2) provide that the base offense level for a substantive offense must be reduced by three levels if the defendant was convicted of an attempt or a conspiracy "unless the defendant completed all of the acts the defendant believed necessary for successful completion of the substantive offense."  Second, Application Note 3(E)(I) of section 2B1.1 provides that loss shall be reduced by the money returned.  Third, Application Note 3(B) provides that the gain to the defendant may be an alternate measure of loss.  Fourth, under Application Note 1, the only people who can qualify as a "victim" under section 2B1.1 are people who sustained an actual loss.  Taken together, these conflicting and inconsistent standards for measuring loss create an ambiguity which, consistent with the rule of lenity, must be interpreted in a manner "to avoid an increase in the penalty prescribed by the offense."  *United States v. Hinckley,* 550 F.3d 926, 932, fn. 4 (10th Cir. 2008).

Actual loss is the fairest, most direct measurement of the loss in this case.  Obviously, an incomplete attempt to steal $1.3 million is not the equivalent of actually stealing that sum of

money.  Consequently, Mr. Gonzales respectfully submits that any effort to sentence him based on the intended loss unreasonably over-emphasizes his mental state at the expense of a rational consideration of the actual harm suffered by the state unemployment agencies.

### B.   There are Only Three Victims.

Section 2B1.1(b)(2)(B) provides for a four-level increase for offenses involving fifty or more victims.  However, the Guidelines plainly define a "victim" as "any person who sustained any part of the *actual loss* determined under section (b)(1)."  USSG § 2B1.1, Application Note 1 (emphasis added).  Subsection (b)(1), in turn, refers exclusively to the monetary loss occasioned by the crime, and the relevant Application Note explains that actual loss must be "pecuniary harm . . . that is monetary or that otherwise is readily measurable in money." *Id.* at Application Note 3(A)(I) and (iii), *see also United States v. Leach,* 417 F.3d 1099, 1106-07 (10th Cir. 2005)

The Pre-Sentence Investigation Report has erred as a matter of law in recommending an enhancement for more than fifty victims in Paragraph 69.  The Government can only show by clear and convincing evidence that three state unemployment agencies suffered an actual, monetary loss as defined by the Guidelines.

Pecuniary harm does not include inchoate losses that do not materialize into an actual, monetary loss. *United States v. Sutton,* 582 F.3d 781, 785 (7th Cir. 2009) [individuals whose Medicaid numbers were used as a part of the fraud are not victims of a Medicaid fraud].  Therefore, because the Pre-Sentence Investigation Report plainly documents that there were only three victims in this case who suffered an actual loss (PSR ¶¶ 62, 129), no additional upward adjustment for multiple victims is warranted. *Id.* at 786, *quoting United States v. Icaza,* 492 F.3d 967, 969-70 (8th Cir. 2007) [district court erred by treating many individual Walgreens stores as

-14-

victims when all pecuniary harm could be traced to a single parent corporation].

      **C.**    **The Guidelines Prohibit an Enhancement for the Use of Any Means of Identification.**

      Paragraph 71 of the Pre-Sentence Investigation Report has recommended an enhancement of two levels for the offense of mail fraud under section 2B1.1[B][11][C][I] based on "the unauthorized transfer or use of any means of identification." However, this enhancement is foreclosed by the plain terms of section 2B1.6 of the Guidelines, which prohibits the application of "any specific offense characteristic for the transfer, possession or use of a means of identification when determining the sentence for the underlying offense" if a mandatory, consecutive sentence is imposed for the offense of aggravated identity theft. Section 2B1.6, Application Note 2. This note provides a specific, Guideline rule against double counting.

      Section 2B1.6 compels the sentencing court to impose a consecutive punishment for identity theft counts punishable under 18 U.S.C. § 1028A. However, to avoid enhancing the defendant's sentence twice for the same conduct–once under the Guideline for the predicate offense and again under section 1028A–the Sentencing Commission has directed judges not to apply any specific offense characteristic for the transfer, possession or use of a "means of identification." USSG § 2B1.6, note 2. The rationale for this prohibition is that the sentence for aggravated identity theft already accounts for this offense conduct. *United States v. Zheng,* 762 F.3d 605, 606 (7th Cir. 2014).

      The mandatory term of imprisonment for Count VI of the Indictment is two years in prison and this sentence must be imposed consecutively to any other count. (PSR ¶¶ 114, 115.) Therefore, because Mr. Gonzales will receive the two-year consecutive sentence on the identity

theft count, his sentence for the underlying offense is not eligible for a two-level increase for

"transfer, possession or use" of false identification.  Cf. *United States v. Jones,* 551 F.3d 19, 25

(1ˢᵗ Cir. 2008).

> **D.      The Court Should Depart or Vary from the Recommended Guideline
> Sentence Because Many of the Specific Offense Characteristics, Such
> as the Enhancements for Sophisticated Means and Aggravated Role,
> Overlap and Punish The Same Conduct.**

One aspect of the  re-evaluation of section 2B1.1 by the Sentencing Commission has been

a focus on what some commentators have called "factor creep."  These commentators are

concerned that by "piling on" multiple specific offense characteristics, the Guidelines are

essentially punishing the defendant for the same conduct.  (Courtney Semisch, Sentencing

Symposium, 9/18/13, Tx., pp. 38-39.)

Courts have criticized the process of accumulating overlapping enhancements because

"they are all little more than different ways of characterizing closely related aspects of . . . [a]

fraudulent scheme."  *United States v. Jackson,* 346 F.3d 22, 26 (2ⁿᵈ Cir. 2003).  As the *Jackson*

court explained, "most fraud schemes that obtain more than one half million dollars involve

careful planning, some sophisticated techniques and are extensive."  *Ibid.*  This "piling on" is

particularly problematic when, as here, "any one enhancement increases the sentencing range by

a far greater amount when the enhancement is combined with other enhancements than would

occur if only one enhancement had been imposed."  *Ibid.*

To redress the unjust enhancement of a criminal sentence based on multiple, overlapping

sentencing enhancements, some courts have recognized that:

> "The cumulation of such substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a higher sentencing range, presents a circumstance that is present 'to a degree' not adequately considered by the Commission, see 18 U.S.C. § 3553b)(1), and therefore permits a sentencing judge to make a downward departure. *Cf. United States v. Gigante,* 94 F.3d 53, 56 (2nd Cir. 1996) (downward departure authorized where substantially enhanced sentence range results from a series of enhancements proven only by a preponderance of the evidence), *amending* 39 F.3d 42, 48 (2nd Cir. 1994)."

*United States v. Lauersen,* 348 F.3d 329, 344 (2nd Cir. 2003).  Therefore, when a District Court imposes multiple, similar sentencing enhancements, the Court "may exercise discretion to mitigate the effect of the enhancement by making a downward departure. *Ibid*.

Mr. Gonzales contends that while some of the enhancements proposed in the Pre-Sentence Investigation Report may arguably apply, this Honorable Court should depart or vary from the recommended Guideline sentence because these enhancements over lap and essentially punish the same conduct.  In addition, Mr. Gonzales argues that a departure or a variance is warranted because of the unwarranted sentence disparity created by sentencing him based on the loss amount combined with four specific offense characteristics.

### 1.    Sophisticated Means and Aggravating Role Overlap

Mr. Gonzales submits that the enhancements for sophisticated means and being an organizer, leader or manager are substantially related and overlap because they are both a necessary attribute of a wide-raging scheme which defrauded three state unemployment agencies of almost a million dollars.  Consequently, because these enhancements are duplicative and arguably double count the same wrongful conduct, a departure or variance may be warranted.

"Sentencing courts err when precisely the same aspects of a defendant's conduct factors into his sentence in two separate ways." *United States v. Smith,* 516 F.3d 473, 476 (6th Cir.

-17-

2008).  Impermissible double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.  *Ibid.*

An enhancement for sophisticated means is proper when the defendant's conduct shows a greater level of planning or concealment than a typical fraud of its kind.  Often for a sophisticated means enhancement to apply, the scheme must be especially complex or intricate or involve the use of fictitious entities or corporate shells.  USSG § 2B1.1, Application Note 9(B).  Similarly, section 3B1.1(a) provides an increase of four levels if the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

By their plain terms, the enhancements for "sophisticated means" and being an "organizer, leader or manager" appear to involve much of the same conduct.  Both enhancements require the wrongful criminal conduct to be "extensive."  Both demand that the defendant participate in a complex scheme, often with multiple co-conspirators.  For both enhancements to apply, the District Court must consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices . . . the degree of participation in planning and organizing the offense [and] the nature and scope of the illegal activity."  *United States v. Snow,* 663 F.3d 1156, 1162 (10th Cir. 2011) [interpreting § 3B1.1]. Therefore, these enhancements will often over-lap, particularly in an extensive fraud.

Mr. Gonzales respectfully submits that it is difficult to commit a fraud of almost a million dollars against three separate state unemployment agencies without at the same time organizing an illegal enterprise that involves sophisticated means and multiple co-participants.  Therefore, because these wrongful acts are fully taken into account by the actual loss to the three state

unemployment agencies, imposition of additional sentencing enhancements would be

duplicative.  In the alternative, these multiple, over-lapping sentencing enhancements may justify

a departure or a variance.

## 2.    Overlapping Sentence Enhancements Create Unwarranted Sentencing Disparities

A recent review of sentences under section 2B1.1 by statisticians at the United States

Sentencing Commission has found that the imposition of multiple sentencing enhancements in

fraud and theft cases is relatively rare.  This analysis has shown that for offenders sentenced

under 2B1.1 in 2012, fifty percent of the defendants received an increase from the loss table and

nothing else.  Only about a third of the offenders received an increase from the loss table and at

least one other specific offense characteristic.  (Courtney Semisch, Sentencing Symposium,

9/18/13, Tx., pp. 40.)

Of this sub-set of those one-third of the offenders who were sentenced under both the loss

table and at least one other specific offense characteristic, 63.2% received an increase from the

loss table and only one additional specific offense characteristic.  Another 27.8% of these

offenders received an increase from the loss table and two additional specific offense

characteristics.  Only 8 % of this subset received an increase based on the loss table and three

specific offense characteristics and only .9% received an increase from the loss table and four

additional specific offense characteristics.  (Courtney Semisch, Sentencing Symposium, 9/18/13,

Tx., pp. 40-41.)

Mr. Gonzales contends that offenders who are subjected to sentencing under 2B1.1 based

on the loss table and more than two specific offense characteristics are outliers who suffer

unnecessarily based on "factor creep."  He further submits that any effort to punish such an

offender, like him, creates an unreasonable and unwarranted sentence disparity among similarly

situated offenders which this Honorable Court should seek to avoid under 18 U.S.C. § 3553.

> **III.   THIS HONORABLE COURT SHOULD DEPART OR VARY FROM THE SENTENCE RECOMMENDED BY THE UNITED STATES SENTENCING GUIDELINES BASED ON MR. GONZALES' UNIQUE HISTORY AND CHARACTERISTICS.**

A sentencing court must begin its analysis by correctly calculating the applicable

Guidelines range and then should consider all of the section 3553(a) factors to determine whether

they support the sentence requested by the parties.  *Gall v. United States,* 552 U.S. 38, 50 (2007).

The Court must make an individualized assessment based on all of the facts to determine whether

a departure or variance is warranted.  *Ibid.*  After conducting this inquiry, a District Court is free

to impose <u>any</u> sentence that is "reasonable" and may depart or vary from the Guidelines for any

fair and just reason.  *United States v. Smart,* 518 F.3d 800, 804 (10th Cir. 2008.)

In a criminal case, a United States District Court Judge has the discretion to impose <u>any</u>

sentence which is reasonable, so long as the Judge fully and fairly considers the sentencing

factors in section 3553(a).  *United States v. Cage,* 451 F.3d 585, 595 (10th Cir. 2006); *United

States v. Hildreth,* 485 F.3d 1120, 1130 (10th Cir. 2007).  A substantively reasonable criminal

sentence must ultimately reflect the gravity of the crime and the § 3553(a) factors as applied to

the case, including the history and characteristics of the defendant.  *United States v. Verdin-

Garcia,* 516 F.3d 884, 895 (10th Cir. 2008), see also *United States v. Angel-Guzman,* 506 F.3d

1007, 1014-15 (10th Cir. 2007).

A defendant's mental and emotional condition – including a history of childhood trauma

and abuse or a diagnosis of Post Traumatic Stress Disorder -- may be relevant in determining the appropriate sentence.  (USSG § 5H1.3).  In addition, in imposing a just and reasonable sentence, a District Court may consider the accused's drug and alcohol dependence, particularly when that disease contributed to the defendant's wrongful conduct.  (USSG § 5H1.4.)  Moreover, the defendant's educational and vocational skills (USSG § 5H1.2) and his long and steady employment history (USSG § 5H1.5) may also justify a departure or variance.  Further, although a defendant's lack of guidance as a youth is ordinarily not relevant in determining whether a departure is warranted (USSG § 5H1.12), a Court may consider this factor in combination with other aspects of the defendant's background in assessing "the history and characteristics of the defendant."  18 U.S.C. § 3553, subd. (a)(1).  Finally, a District Court may vary from a recommended Guideline sentence without finding that any of these factors are present to an extraordinary degree.  *Smart,* 518 F.3d at 808, see also *United States v. Ranum,* 353 F.Supp.2d 984, 989 (E.D. Wis. 2005).

A District Court may also consider a defendant's extraordinary acceptance of responsibility in determining whether to vary from the sentence recommended by the Guidelines, despite the prohibition in the Guidelines which limit such departures to those authorized by sections 3E1.1 and 5K1.1.  *United States v. Severino,* 454 F.3d 206, 211 (3rd Cir. 2006), *see also United States v. Jones,* 158 F.3d 492, 498 (10th Cir. 1998).  "Courts may grant additional consideration to defendants who demonstrate acceptance beyond that necessary to obtain a two or three level reduction under § 3E1.1 because such conduct bears directly on their character and on how severe a sentence is necessary to provide deterrence and punishment."  *United States v. Severino, supra,* 454 F.3d at 211, *citing United States v. Milne,* 384 F.Supp.2d 1309, 1312

(E.D.Wis. 2005).[2]

Finally, a court may consider "post offense rehabilitative efforts" in deciding whether to grant a reduction of a criminal sentence. *United States v. Rutherford,* 323 F.Supp.2d 911, 914 (E.D.Wis. 2004), citing USSG § 3E1.1, Application Note 1(g). Such a departure allows "truly repentant defendants to earn reductions in their sentences based on a demonstrated commitment to repair and rebuild their lives." *Ibid, citing United States v. Sally,* 116 F.3d 76, 81 (3rd Cir. 1997), *see also Gall v. United States,* 552 U.S. 38, 59 (2012). In assessing a defendant's post offense efforts at rehabilitation, a court may consider the defendant's adherence to his conditions of release and his sincere effort to improve his life. *United States v. Jones,* 158 F.3d 492, 52 (10th Cir. 1998).

There are many aspects of Mr. Gonzales history and characteristics which mitigate this very serious criminal offense. As a survivor of childhood trauma and abuse, Mr. Gonzales has struggled with depression and anxiety since he was young and he has repeatedly sought treatment for his mental health disease. While confined in the Utah State Penitentiary, Mr. Gonzales did everything he could to improve his life, culminating in the receipt of a Bachelor's of Arts in accounting. Following his release from prison in 2002, Mr. Gonzales successfully completed sex offender treatment, was discharged from parole without a single violation and began a productive life as a bookkeeper and an accountant. He married, started a family and enjoyed a sustained

---

[2] A defendant demonstrates a more profound and enduring acceptance of responsibility when his post-arrest cooperation facilitates the efficient administration of the criminal justice system and protects the public from additional criminal activity. M O'Hear, "Remorse, Cooperation and 'Acceptance of Responsibility;' The Structure, Implementation and Reform of Section 3E1.1," 91 N.W.U.L.Rev. 1507, 1511 (1997). Active cooperation to redress prior wrong demonstrates a more exceptional acceptance of responsibility which provides "a sound indicator of rehabilitative potential." *Id.* at 1515.

period of rehabilitation until he succumbed to the effects of his untreated drug addiction and compulsive gambling by reverting to criminality.

More important, since law enforcement agents searched his home in May 2012, Mr. Gonzales has been "doing everything in his power to forge a new life." Cf. *Gall,* 552 U.S. at p. 44.  He has repeatedly cooperated with the Government in the investigation of his wrongful conduct, he has complied with all of the conditions of his pre-trial release, and he has undergone drug counseling.  In short, Mr. Gonzales has made a concerted effort to improve his life and to make amends for his wrongful conduct.

Mr. Gonzales respectfully submits that, to impose a just and fair sentence in this case, this Honorable Court should consider his history and characteristics and his profound change in his behavior since May 2012.  In particular, Mr. Gonzales contends that his mental and emotional condition, his extraordinary acceptance of responsibility and his post offense efforts at rehabilitation together justify a departure or a variance from the sentence recommended by the United States Sentencing Guidelines.

WHEREFORE, for all of the foregoing reasons, Mr. Gonzales respectfully requests that this Honorable Court sustain each of his Objections to the Pre-Sentence Investigation Report and depart or vary from the sentence otherwise recommended by the United States Sentencing Guidelines to impose a sentence of no more than 81 months in the custody of the United States Bureau of Prisons.

Respectfully Submitted,

/s/ *Brian A. Pori* filed electronically 11/20/14
Brian A. Pori
Assistant Federal Public Defender
111 Lomas Blvd NW, Suite 501
Albuquerque, N.M. 87102-2373
(505) 346-2489 [telephone]

Counsel for Jasonn Gonzales

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of November, 2014, I filed the foregoing

Defendant's Sentencing Memorandum electronically through the CM/ECF system, which caused

a copy of the pleading to be served electronically on opposing counsel of record addressed as

follows:

Tara Neda, Esq.
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103

/s/ filed electronically 11/20/14
Brian A. Pori