# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                               No. CR 14-0922 JB

JASONN GONZALES,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum, filed November 20, 2014 (Doc. 62)("Sentencing Memorandum"). The Court held a sentencing hearing on December 4, 2014. The primary issues are: (i) whether the Court should impose a 16-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1), because the intended loss exceeded $1,000,000.00; (ii) whether the Court should impose a 4-level enhancement under § 2B1.1(b)(2)(B), because the offense involved fifty or more victims; (iii) whether the Court should impose a 2-level enhancement pursuant to § 2B1.1(b)(10)(C), because the offense involved sophisticated means; (iv) whether the Court should impose a 4-level aggravated role enhancement under § 3B1.1(a); (v) whether the Court should grant Defendant Jasonn Gonzales a downward departure under § 5H1.3 based on his mental and emotional health, and/or under § 5H1.4 based on his physical condition, including drug or alcohol abuse, or gambling addiction; (vii) whether the Court should grant Gonzales a downward departure or variance based on his cooperation with law enforcement, his post-offense rehabilitation efforts, his "extraordinary" acceptance of responsibility, his educational and vocational skills, his long and steady employment history, his lack of guidance as a youth, or based on the need to avoid unwarranted

sentencing disparities; and (viii) what restitution the Court should impose upon Gonzales. Gonzales' objections to the PSR are sustained in part and overruled in part. The Court sustains Gonzales' objection to paragraph 71 of the Original PSR, which imposed a 2-level enhancement under § 2B1.1(b)(11)(C)(i). The Court also sustains in part Gonzales' eighth objection -- to paragraph 136 of the PSR -- to the extent that it varies from the Guidelines. The Court overrules all other objections and denies all requests for a downward departure. The Court will vary, but not as much as Gonzales requested. Finally, the Court has made a diligent effort to avoid any procedural or substantive error.

**FACUTAL BACKGROUND**

The Court takes its facts from the Presentence Investigation Report (re-disclosed November 25, 2014)("PSR"), which the United States Probation Office ("USPO") prepared. The Court will first outline the facts of Gonzales' offense. The Court will then describe Gonzales' criminal history, his other personal characteristics, and his education and financial condition.

1. **The Offense of Conviction.**

From January 2009 to May 2012, Gonzales and co-Defendant Gerald Archuleta, along with other unindicted individuals, took part in a conspiracy to devise a scheme to defraud and obtain money, specifically unemployment insurance benefits, from the Texas Workforce Commission, Colorado Department of Labor and Employment, and New Mexico Department of Workforce Solutions by means of materially false and fraudulent pretenses and representations and, for the purpose of executing the scheme and artifice, did knowingly cause the United States Postal Service and commercial interstate carrier to move and deliver envelopes containing debit cards by which benefits were paid. See PSR ¶ 5, at 4.

To carry out their scheme, Gonzales and Archuleta fraudulently obtained "names, social security numbers, and dates of birth of individuals without such individuals' knowledge." PSR ¶ 6, at 5. Further, "the defendants provided TWC, CDLE, and NMDWS with false and fictitious quarterly reports listing non-existent companies that reflected the names of individual identities as the employees of the fictitious companies." PSR ¶ 6, at 5. "The defendants would then apply for UI benefits under such individuals' identities without their knowledge or authority and provide TWC, CDLE, and NMDWS with the names of false and fictitious last employing units (LEUs) and LEU addresses that they controlled." PSR ¶ 6, at 5. To provide fictitious LEU addresses, Gonzales and Archuleta traveled across state lines for the purpose of opening various post office boxes to use in their scheme. See PSR ¶ 6, at 5. Once these post office boxes were opened, the Defendants reported the fictitious address to receive debit cards containing unemployment insurance benefits to be sent via the United States Postal Service and private commercial interstate carrier. See PSR ¶ 6, at 5. Upon receipt of these debit cards, Gonzales and Archuleta used the debit cards for their own personal use and benefit. See PSR ¶ 6, at 5. The investigation revealed that the defendants opened sixty-one postal office boxes throughout Texas, Colorado, and New Mexico. See PSR ¶ 7, at 5. The scheme fraudulently used approximately 107 victim identities and was connected to twenty fictitious companies -- eleven in New Mexico, seven in Colorado, and two in Texas. See PSR ¶ 7, at 5. "The scheme resulted in a total loss of $804,735.73." PSR ¶ 7, at 5.

2.  **Gonzales' Criminal History up to the Offense of Conviction.**

Gonzales has two prior criminal convictions. See PSR ¶¶ 80-81, at 22. First, on December 13, 1988, Gonzales was sentenced to an unknown term of probation for indecent exposure in the Superior Court of California -- Juvenile Court, Los Angeles. See PSR ¶ 80, at

22. At the time of the referral, on August 16, 1988, Gonzales was sixteen years old. See PSR ¶ 80, at 22. The PSR further states:

> Court documents reflect on August 16, 1988, and August 22, 1995, the defendant did willfully, unlawfully, and lewdly expose his private parts in a public place where other people were present, offended, and annoyed. In addition, on August 11, 1998, the defendant solicited another to engage in the same conduct. Four counts for Lewd Conduct and one count of Indecent Exposure were dismissed.

PSR ¶ 80, at 22. Second, on March 9, 1991, when Gonzales was eighteen years old, he was arrested in Utah and charged with: (i) one count of attempted rape; (ii) one count of attempted sodomy/forcible sodomy; and (iii) one count of attempted burglary of a dwelling. See PSR ¶ 81, at 22. The PSR states that, on May 3, 1991, Gonzales was sentenced to fifteen years as to count one, and as to count three, not more than five years, all to run concurrently. See PSR ¶ 81, at 22. Regarding this conviction, the PSR also states:

> The defendant was represented by counsel. The Information reflects that on February 10, 1991, the defendant had sexual intercourse with another who was not his spouse and without her consent. The offense was committed during the course of a burglary, where he caused physical injury to another while attempting to flee. Due to the age of the offense, law enforcement narrative reports were not available. The defendant was not arrested in this matter until March 9, 1991. Additional counts for Rape and Aggravated Burglary were dismissed.
>
> The defendant was released to parole supervision on March 12, 2002. He successfully discharged parole on January 16, 2006. Contact with the New Mexico Adult Probation and Parole Office (provided supervision for Utah through Interstate Compact) reflects the defendant had no violations while on parole and successfully completed Sex Offender Treatment as required. The defendant is required to register as a sex offender annually, for life. H[e] first registered in the state of New Mexico in 2003, and his last registration occurred on August 13, 2014 (Registration # 48714).

PSR ¶ 81, at 22.

The New Mexico Courts Database also reflects that Gonzales was issued citations for speeding on August 8, 2006, January 2, 2013, and September 25, 2013. See PSR ¶ 84, at 23. Gonzales was convicted in two of these matters and received a deferred sentence and fees. See

PSR ¶ 84, at 22.  The remaining case was dismissed.  See PSR ¶ 84, at 22.  Finally, Gonzales

was arrested on two other occasions.  See PSR ¶¶ 87-88, at 23-24.  On January 31, 2007, when

Gonzales was thirty-four years old, he was arrested and charged for "Patronizing Prostitutes" in

Bernalillo County Metropolitan Court in Albuquerque, New Mexico.  PSR ¶ 87, at 23.  The PSR

states that, on June 26, 2007, the case was dismissed, and further explains:

> The defendant was represented by counsel.  Arrest reports reflect officers
> observed a known prostitute enter a vehicle driven by the defendant.  The vehicle
> drove multiple back roads before stopping in an empty parking lot.  Officers made
> contact with the defendant, who admitted he agreed to pay the prostitute $30 for
> fellatio.

PSR ¶ 87, at 23.  On April 30, 2011, when Gonzales was thirty-eight years old, he was arrested

for "Registration of Sex Offenders Information Required."  PSR ¶ 88, at 24.  The PSR lists the

agency involved as "Rio Arriba Magistrate Court, Espanola, NM," and states that, on March 26,

2014, the case was dismissed.  PSR ¶ 88, at 24.  Regarding this incident, the PSR further

explains: "The defendant was represented by counsel.  He was arrested in this matter on July 28,

2011.  Contact with the Rio Arriba Magistrate Court revealed that all records in this case were

destroyed in 2011.  There is no further information available regarding this charge."  PSR ¶ 88,

at 24.

   3.    **Gonzales' Personal Characteristics.**

Gonzales was born on July 19, 1972, in Van Nuys, California.  See PSR ¶ 90, at 24.

Gonzales' father is employed as a machine operator in parts production.  See PSR ¶ 90, at 24.

"His mother, with whom he resides, owns the Purple Adobe Lavender Farm and tea room, which

deals primarily in lavender plant and product sales."  PSR ¶ 90, at 24.  Gonzales' parents

terminated their relationship when he was two-years-old.  See PSR ¶ 91, at 24.  Gonzales has

indicated that his parents' relationship during his childhood and formative years was "volatile

and unhealthy," because of his father's abusive behavior. PSR ¶ 91, at 24. Upon his parents' separation, Gonzales lived with his father for one year, before returning to his mother's care when he was approximately three-years old. See PSR ¶ 91, at 24. He continued to visit his father, but Gonzales has indicated that the time he spent with his father resulted in psychological and emotional abuse. See PSR ¶ 91, at 24. His father would speak negatively about his mother and would turn him against her by making him feel guilty for having a good relationship with her. See PSR ¶ 91, at 24. His father would also involve him in arguments with his mother. See PSR ¶ 91, at 24. "Additionally, the defendant indicated his father is habitually unfaithful when he is in a relationship, which he discussed at length with the defendant when he was a teenager." PSR ¶ 91, at 24.

Gonzales' relationship with his father deteriorated to the point that they would not have contact for years at a time. See PSR ¶ 91, at 24. Gonzales' wife reported that Gonzales did not have contact with his father from the time he was eighteen -- 1990 -- until approximately 2008. See PSR ¶ 91, at 25. Gonzales currently has contact with his father each month and described their relationship as "okay." PSR ¶ 91, at 24. Gonzales' wife stated that Gonzales' relationship with his father had improved greatly. See PSR ¶ 91, at 25. Gonzales has always had a good relationship with his mother. See PSR ¶ 91, at 24. Gonzales indicated that, despite his father's conduct, when he was growing up, his parents met all of his economic needs. See PSR ¶ 91, at 24-25. Gonzales' wife and mother reported that an unknown female baby-sitter sexually abused Gonzales when he was approximately five-years-old. See PSR ¶ 91, at 25. The baby-sitter was in her early twenties and Gonzales' mother indicated he disclosed the abuse to her about thirty years ago, when he was five-years-old. See PSR ¶ 91, at 25. No charges were filed in the matter. See PSR ¶ 91, at 25.

"Gonzales indicated that his ex-step-mother, Cheryl Hawkins-Smith, age 65, was present during his childhood beginning at age five." PSR ¶ 92, at 25. She is retired in Santa Clarita, California. See PSR ¶ 92, at 25. Gonzales reported annual contact with her and stated that they maintain a good relationship. See PSR ¶ 92, at 25. Gonzales' step-father, Roger Inman, was also present in his life beginning at age five. See PSR ¶ 92, at 25. Gonzales currently resides with his mother and Mr. Inman, with whom Gonzales has a good relationship. See PSR ¶ 92, at 25. Gonzales reported three siblings: Mark Gonzales, Jaimee Lainse, and Mike D'Antonio. See PSR ¶ 93, at 25. Gonzales has not had contact with his brother Mark for five years, because of a falling out over his prior criminal history. See PSR ¶ 94, at 25. Gonzales has monthly contact with his sister Jaimee and has had no contact with his step-brother Mike in approximately nine months. See PSR ¶ 94, at 25. Gonzales' wife indicated that his brother Mike "disowned" him following his felony conviction in 1991. PSR ¶ 94, at 25.

Gonzales was raised in various communities in California. See PSR ¶ 95, at 25. When he was eight years of age, Gonzales relocated to Utah, where he was incarcerated until 2002. See PSR ¶ 95, at 25. Following his incarceration, Gonzales relocated to New Mexico, where he lived in La Mesilla and Espanola. See PSR ¶ 95, at 25. Gonzales began a relationship with Rhonda Gonzales in December 2005, they were married in 2006, and they settled in Velarde in 2006. See PSR ¶ 96, at 26. "One child was conceived from this relationship, Jordynn Oliva Gonzales, age 7." PSR ¶ 96, at 26. Jasonn and Rhonda Gonzales separated in January, 2014, and divorce is pending. See PSR ¶ 96, at 26. Ms. Gonzales resides in Velarde with their daughter. See PSR ¶ 96, at 26. Ms. Gonzales is employed as a teacher and is in good health, but their daughter suffers from asthma. See PSR ¶ 96, at 26. Gonzales indicated that he is also the step-father of Gonzales' son from a prior relationship, Joshua Gomez, age twenty, whom

Gonzales has helped raise since he was eleven-years-old.  See PSR ¶ 96, at 26.  Ms. Gonzales indicates that her marriage with Gonzales began to dissolve when the investigation for this federal offense began, "as it greatly affected her ability to trust the defendant."  PSR ¶ 96, at 26. Gonzales "began residing intermittently with his mother from March 2013, until January, 2014, when he moved permanently to his mother's home after separating from his wife."  PSR ¶ 96, at 26.  The residence is a mobile home that is located on the same land as the family lavender farm. See PSR ¶ 96, at 26.

Gonzales is six feet, one inch tall and weighs 410 pounds.  See PSR ¶ 97, at 26.  He reports that he suffers from Asthma and plantar fasciitis.  See PSR ¶ 97, at 26.  "He has been prescribed albuterol, and advair to treat his asthma symptoms."  PSR ¶ 97, at 26.  He was previously prescribed codeine for pain, but stated that he became addicted to the medicine, "and has since started taking Suboxone, which is used to treat opiate dependence."  PSR ¶ 97, at 26. Documentation provided to the supervising pre-trial officer reflects that Gonzales has also been prescribed prednisone for inflammation.  See PSR ¶ 97, at 26.  Gonzales has a surgical scar on his stomach, and Ms. Gonzales indicated that Gonzales has a history of past hospitalizations because of ulcers in his legs that became badly infected.  See PSR ¶ 98, at 26.

> She indicated that the defendant had lap-band surgery in 2009, and has lost 100 pounds since that time.  She added she believes the defendant has a gambling addiction.  Contact with the investigating case agent revealed some of the proceeds from the instant offense were spent at casinos near the defendant's residence.

PSR ¶ 98, at 26-27.

Gonzales reported that he was hospitalized because of mental health issues when he was approximately sixteen-years-old.  See PSR ¶ 99, at 27.  Regarding this period of time, the PSR states:

He indicated he was having issues with anger and began getting into trouble at school and skipping classes resulting in expulsion. The defendant stated his mother was very pro-active in getting him treatment when she observed him having problems in school. He was taken to an unknown inpatient mental health facility in Calabasas, California, where he remained for 6 to 8 months. He was then released to Provo Canyon High School, a boarding school, which provided mental health treatment in addition to academic curriculum. He reported he has not experienced any issues since that time and feels some of his issues can be attributed to his relationship with his father.

PSR ¶ 99, at 27. During Gonzales' presentence interview, Gonzales was asked whether he had any sexual abuse in his past, to which he responded there was none. See PSR ¶ 99, at 27. The PSR further states:

Information received from Provo Canyon High School reflects the defendant was there form [sic] September 15, 1989, through December 20, 1990. He was diagnosed with Dysthymic Disorder, Intermittent Explosive Disorder, and generalized anxiety disorder. Upon completion, the defendant attended outpatient counseling with an unknown provider until his arrest in March 1991. Additional information regarding his treatment was not available due to the age of the records. Contact with the New Mexico Adult Probation and Parole Office reflects the defendant attended Sex Offender Treatment as a requirement of his parole completion on March 23, 2004. The defendant's mother verified his mental health history and indicated he attended "intense" therapy sessions. Due to the time that has elapsed since then, she was unable to recall specific details regarding the defendant's behavior or the time spent in treatment.

PSR ¶ 99, at 27.

Gonzales reported a history of addiction to prescription pain medication. See PSR ¶ 100, at 27. "Upon his release on pretrial supervision, with the permission of his supervising officer, he self-referred himself to Presbyterian Medical Services Santa Fe Community Guidance Center and was prescribed Suboxone via transdermal patch (Butrans 10mcg/hour), to address his opiate addiction." PSR ¶ 100, at 27. The prescribing physician did not recommend counseling and the USPO did not refer Gonzales to counseling. See PSR ¶ 100, at 27. "Gonzales reported experimental use of marijuana approximately ten times during his life, with his last use 8 years ago." PSR ¶ 100, at 27. Gonzales also indicated that he used cocaine for a few months when he

was sixteen-years-old, but that he does not drink. See PSR ¶ 100, at 27. Ms. Gonzales verified that Gonzales does not drink alcohol and reported no known illegal drug use. See PSR ¶ 100, at 27. "She indicated defendant was addicted to prescription pain medication and advised her he was spending as much as $1,500 weekly in 2013, for pills." PSR ¶ 100, at 27-28.

### 4. **Gonzales' Financial Condition.**

The Court will discuss Gonzales' education. It will then review his employment. Finally, the Court will describe Gonzales' assets and liabilities.

### a. **Education and Employment.**

Gonzales attended Agora High School, until he was expelled for truancy, at which point he began attending Indian Hills High School, both in Calabasas, California. See PSR ¶ 101, at 28. He attended Indian Hills High School from February 21, 1989, through May 2, 1989. See PSR ¶ 101, at 28. He was then sent to Provo Canyon Charter High School in Utah, where he remained through December 20, 1990. See PSR ¶ 101, at 28. After submitting documentation to verify his completion of classes at Provo Canyon Charter High School, Gonzales received his high school diploma from Indian Hills High School on June 20, 1991. See PSR ¶ 101, at 28. Then, while Gonzales was incarcerated, he attended Utah State University from September 1992 through June 2001, where he earned a bachelor's degree in Accounting. See PSR ¶ 101, at 28. Gonzales is fluent in English and understands some Spanish. See PSR ¶ 101, at 28. "His scholastic standing is noted as good." PSR ¶ 101, at 28.

From 2002 to 2005, Gonzales worked as an accountant at Shidoni Bronze in Tesuque, New Mexico, but resigned from his position when he secured new employment. See PSR ¶ 108, at 29. The PSR notes, "[a] request for information was submitted to the employer, but has not been received as of this writing." PSR ¶ 108, at 29. From April 24, 2006, to August 4, 2006,

Gonzales was employed as a staff accountant at Akal Security in Santa Cruz, New Mexico, but resigned for unknown reasons. See PSR ¶ 107, at 29. Gonzales was then employed as a bookkeeper in 2006 at Conservation Solutions, Inc. in Santa Fe, New Mexico, but was laid off because the position was temporary. See PSR ¶ 106, at 29. The PSR further states, "[a] request for information was submitted to the employer, but has not been received as of this writing." PSR ¶ 106, at 29. From 2007 to 2008, Gonzales was employed as a scheduler and accountant at J&P Plumbing in Santa Fe. See PSR ¶ 105, at 29. Gonzales was laid off from this position because of lack of a business. See PSR ¶ 105, at 29. Subsequently, between August 4, 2008, and September 25, 2009, Gonzales worked as an accountant at the Ohkay Owingeh Housing Authority in Ohkay Owingeh, New Mexico, but he was "terminated for falsifying his application by failing to disclose his prior felony conviction." PSR ¶ 104, at 29. Since January, 2014, Gonzales' mother has employed him at the Purple Adobe Lavender Farm. See PSR ¶¶ 102-103, at 28. The PSR further states:

> The defendant is employed assisting his mother with her business, which includes a lavender farm, tea room, and gift shop. He completes any tasks that require his assistance and also helps with accounting. He is paid in trade for all of his living expenses. The defendant has been working with his mother intermittently since 2004, but this has been his primary employment since January 2014.

PSR ¶ 103, at 28.

b.      **Assets and Liabilities.**

Gonzales has no substantive income and multiple liabilities. See PSR ¶ 110, at 30. Gonzales' only asset is a Chevy Truck valued at $500.00, while he has numerous liabilities including: (i) $14,541.00 in medical accounts; (ii) a collection account at Chase Bank in the amount of $1,371.00; (iii) a collection account at GM Financial in the amount of $8,388.00; (iv) a collection account at Citibank in the amount of $5,332.00; (v) a Student Loans collection

account in the amount of $3,489.00; (vi) a collection account in the amount of $1,389.00; (vii) a collection account at GE Money Bank in the amount of $464.00; (viii) a collection account at DirecTV in the amount of $160.00; and (ix) a judgment at Los Alamos National Bank in the amount of $44,905.00. See PSR ¶ 110, at 30. Gonzales' total liabilities thus amount to $80,039.00, and he has a total net worth of -$79,539.00. See PSR ¶ 110, at 30. The PSR also states that Gonzales receives $357.00 in food stamps and $495.00 in salary, totaling $852.00 per month. See PSR ¶ 110, at 30. Gonzales has monthly expenses totaling $852.00, including automobile insurance, gasoline, child care/schooling, and groceries/supplies. See PSR ¶ 110, at 30. His total monthly cash flow equals his monthly expenses, leaving him nothing at the end of the month. See PSR ¶ 110, at 30.

Regarding Gonzales' financial condition, the PSR further states:

111.    The defendant provided a copy of a Judgment on the Pleading for a default judgment against the defendant for Los Alamos National Bank (Case No. D-132-CV-2013-00038) in the amount of $47,412.09 plus interest through May 6, 2013, in the amount of $3237.07, and interest in the amount of 7% until paid. This balance appears to represent the total amount of four accounts that were unpaid with the lender. The defendant's wife indicated the defendant owns nothing of value. She stated that the mobile home they resided in belongs to her father (Felix Valdez) as does the property the home is situated on. She added she resided in the home for approximately seven years prior to meeting the defendant as it was provided to her by her father. She stated the default judgment from Los Alamos National Bank includes a vehicle he previously owned that was repossessed (2008 Ford F-250). In addition, she indicated the balance with GM Financial represents the balance of a 2011 Lexus RX that was repossessed. She added she owes the taxes she earned while married to the defendant. Their filing status was married, filing jointly, making the defendant responsible for the outstanding debt as well as Ms. Gonzales. Documentation to verify these balances was requested, but not received prior to the disclosure of this report. The defendant's mother indicated she recently purchased the defendant's truck, but it is registered under his name.

112.    Based on the defendant's financial condition, and because he will be required to pay $804,735.73 in restitution because of this conviction, a fine does not appear feasible.

PSR ¶¶ 111-112, at 31.  Regarding the imposition of restitution, the PSR further states:

**Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $804,735.73 shall be ordered in this case for both defendant's to be paid jointly and severally.  Restitution, as set forth below, is due and owing to the following victims:

| Victim Name | Amount of Loss |
| --- | --- |
| New Mexico Department of Workforce Solutions | $247,929.00 |
| Colorado Department of Labor and Employment | $488,107.00 |
| Texas Workforce Commission | $68,699.73 |
| **TOTAL** | $804,735.73 |

Guideline Provisions: Restitution shall be ordered.  USSG § 5E1.1

PSR ¶¶ 128-129, at 33.

## PROCEDURAL BACKGROUND

The Indictment, filed March 26, 2014 (Doc. 2), charged Gonzales with the following Counts: (i) Count 1 -- Conspiracy to Commit Mail Fraud in violation of 18 U.S.C. § 1349; (ii) Counts 2 through 5 -- Mail Fraud and Aiding and Abetting in violation of 18 U.S.C. §§ 1341 and 2; and (iii) Count 6 -- Aggravated Identity Theft in violation of 18 U.S.C. § 1028A.  See Indictment ¶¶ 5-36, at 4-11.  On August 18, 2014, Gonzales pled guilty to all six Counts of the Indictment.  See Plea Minute Sheet, filed August 18, 2014 (Doc. 51).  On November 5, 2014, the USPO disclosed an initial Presentence Investigation Report ("Original PSR").

1.    **Gonzales' Sentencing Memorandum.**

On November 20, 2014, Gonzales filed a Sentencing Memorandum. <u>See</u> Sentencing Memorandum at 1. In his Sentencing Memorandum, under the heading "Objections to the Pre-Sentence Investigation Report," Gonzales makes eight objections to the Original PSR. Sentencing Memorandum at 2-4. First, Gonzales "challenges the use of an inchoate, intended loss of $1,317,411.00 to increase his base offense level by 16 levels." Sentencing Memorandum at 2. Gonzales contends that his base offense level should be increased only by 14 levels to account for the actual loss of $804,735.73. <u>See</u> Sentencing Memorandum at 2-3. Gonzales further asserts that, if the Court uses the intended loss, rather than the actual loss, to increase his base offense level, then "he is entitled to a three-level reduction for an attempted theft, as set out in Section 2X1.1(b) of the Guidelines." Sentencing Memorandum at 3.

Second, Gonzales argues that there were only three victims in this case, and not more than fifty, as paragraph 69 of the Original PSR contends. <u>See</u> Sentencing Memorandum at 3. Gonzales asserts that "Application Note 1 to Section 2B1.1 defines a 'victim' only as 'any person who sustained any part of the *actual loss* determined under section (b)(1)." Sentencing Memorandum at 3 (emphasis in Sentencing Memorandum). According to Gonzales, there are only three "victims" of fraud in this case: (i) the Texas Workforce Commission; (2) the Colorado Department of Labor; and (iii) the New Mexico Department Solutions. Sentencing Memorandum at 3. Gonzales next "objects generally to an enhancement of his sentence for the use of sophisticated means under 2B1.1[b][10][C] because that fact substantially overlaps with, and is adequately taken into account by, the loss amount in section 2B1.1[b][1][H]." Sentencing Memorandum at 3.

Fourth, Gonzales objects to the Original PSR's paragraph 71. <u>See</u> Sentencing Memorandum at 3. Gonzales asserts:

> Because Mr. Gonzales faces a mandatory, consecutive sentence of 24 months for the crime of aggravated identity theft as admitted in Count VI of the Indictment, Application Note 2 to section 2B1.6, specifically prohibits the use of "any specific offense characteristic for the transfer, possession or use of a means of identification when determining the sentence for the underlying offense" as suggested in Paragraph 71. Mr. Gonzales should not be subjected to the two-level increase recommended by this paragraph because the Guidelines specifically recognize that a two-year consecutive sentence fully "accounts for this factor for the underlying offense of conviction."

Sentencing Memorandum at 3. Gonzales next objects to the Original PSR's paragraph 73, which imposes a 4-level enhancement for being an organizer or leader of criminal activity which involved five or more participants. <u>See</u> Sentencing Memorandum at 3-4. Gonzales maintains that this enhancement "substantially overlaps with, and is adequately taken into account by, the loss amount in section 2B1.1[b][1][H]." Sentencing Memorandum at 4.

Sixth, Gonzales objects to the Original PSR's paragraph 134, contending that "a downward departure based on his Mental and Emotional Condition under section 5H1.3 would be appropriate in this case." Sentencing Memorandum at 4. Seventh, Gonzales "submits that a departure based on his serious addiction to prescription pain medication and his persistent, untreated gambling addiction could together justify a departure under section 5H1.4 because these addictions are present to an unusual degree and substantially contributed to the commission of the charged offense." Sentencing Memorandum at 4. Finally, objecting to the Original PSR's paragraph 136, Gonzales asserts:

> [I]n addition to the factors identified in the Pre-Sentence Investigation Report which could support a departure or a variance, this Honorable Court can depart or vary from the sentence recommended by the United States Sentencing Guidelines in an effort to avoid unwarranted sentencing disparities caused by substantially overlapping specific offense characteristics which unreasonably aggregate Mr. Gonzales' sentence. Cf. *United States v. Lauersen*, 348 F.3d 329 (2nd Cir.

20[03]).  In addition, Mr. Gonzales contends that this Honorable Court could depart or vary based on his cooperation with law enforcement officers following the detection of his criminal offense and his post-offense efforts at rehabilitation.

Sentencing Memorandum at 4.

Gonzales asserts broadly that "a sentence of no more than 81 months in prison is sufficient, without being greater than necessary, to reflect the seriousness of the offense, provide just punishment and promote respect for the law."  Sentencing Memorandum at 8.  Gonzales maintains that a sentence of 81 months in prison is appropriate under a correct application of the Guidelines, and that the Court "would be justified in departing, or varying, from the sentence recommended by the Guidelines in light of his mental and emotional condition, his chronic drug and gambling addiction, his post-offense efforts at rehabilitation and his cooperation with law enforcement officials."  Sentencing Memorandum at 8-9.  Gonzales then makes three high-level arguments: (i) that the recommended guideline sentence, based on five specific offense characteristics, which were not alleged in the indictment or admitted by Gonzales, violates the Fifth and Sixth Amendments to the Constitution of the United States of America; (ii) that the specific offense characteristics set forth in the Original PSR are not applicable or substantially overlap; and (iii) that the Court should depart or vary from the recommended guidelines sentence based on Gonzales' unique history and characteristics.  See Sentencing Memorandum at 9-20.

On the first point, Gonzales argues that, if the Court relied only on the facts alleged in the Indictment and which Gonzales admits, "the final adjusted offense level would be 18 and the criminal history category will be II, yielding a recommended Guideline sentence of 30 to 37 months followed by a mandatory consecutive 24 months for a total sentence of 54 to 61 months." Sentencing Memorandum at 9.  According to Gonzales, the Original PSR recommends a sentence of 159 to 192 months "based on a myriad of inapplicable sentencing factors which were

never alleged in the Indictment or admitted by Mr. Gonzales." Sentencing Memorandum at 9. Gonzales argues that "the imposition of such a dramatically increased sentence would clearly violate the Fifth and Sixth Amendments." Sentencing Memorandum at 9. Gonzales cites to United States v. Staten, 466 F.3d 708, 717 (9th Cir. 2006), for the proposition that "constitutional error may occur if a judge-found fact is determined only by a preponderance of the evidence." Sentencing Memorandum at 10-11. According to Gonzales, the United States Court of Appeals for the Ninth Circuit stated that, "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the conviction, the government must prove such a factor by clear and convincing evidence." Sentencing Memorandum at 11 (quoting United States v. Staten, 466 F.3d at 717). Gonzales concedes that the United States Court of Appeals for the Tenth Circuit has not "expressly decided this important question," but asserts that the Tenth Circuit has nonetheless "left open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount." Sentencing Memorandum at 11 (quoting United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)). Gonzales argues:

> The Pre-Sentence Investigation Reports recommends tripling the sentence recommended by the Guidelines based on the facts alleged in the Indictment on the basis of a variety of "judgefound" facts which were not alleged in the Indictment or admitted by Mr. Gonzales. This exercise in judicial fact finding inexorably increases Mr. Gonzales's sentence as surely as the facts found by the judge in *Alleyne*, in violation of the Fifth and Sixth Amendment. Therefore, Mr. Gonzales respectfully submits that the Constitution forbids this Honorable Court from using these uncharged facts and unproven misconduct to increase his sentence, especially if the Court finds these facts based on a preponderance of the evidence.

Sentencing Memorandum at 11.

As stated above, Gonzales' second high-level argument is that "the specific offense characteristics set out in the pre-sentence investigation report are inapplicable or substantially

overlap." Sentencing Memorandum at 11. Gonzales argues that he should be sentenced only for the actual loss that the three state unemployment agencies suffered and that his sentence should not be enhanced by any additional specific offense characteristics. See Sentencing Memorandum at 12. Gonzales maintains that enhancing his offense level with the specific offense characteristics that the Original PSR sets forth is "either expressly prohibited by the plain terms of the Guidelines or is even more severe than necessary to account for the nature and circumstances of the charged crimes." Sentencing Memorandum at 12. First, Gonzales contends that "any effort to punish him for inchoate, unrealized loss is inconsistent with other, competing sections of the Guidelines." Sentencing Memorandum at 13. He argues that actual loss is the fairest, most direct measurement of loss in this case, maintaining that an incomplete attempt to steal $1.3 million is not equivalent to actually stealing that sum of money. See Sentencing Memorandum at 13. Second, Gonzales argues that the PSR erred in recommending an enhancement for more than fifty victims under § 2B1.1(b)(2)(B). See Sentencing Memorandum at 14. Gonzales maintains that the United States "can only show by clear and convincing evidence that three state unemployment agencies suffered an actual, monetary loss as defined by the Guidelines." Sentencing Memorandum at 14. Gonzales cites to United States v. Sutton, 582 F.3d 781, 785 (7th Cir. 2009), for the proposition that "[p]ecuniary harm does not include inchoate losses that do not materialize into an actual monetary loss." Sentencing Memorandum at 14. Gonzales therefore maintains that, because the Original PSR documents that there were only three victims who suffered actual loss, an additional upward adjustment for multiple victims is unwarranted. See Sentencing Memorandum at 14.

Third, Gonzales asserts that § 2B1.6 forecloses the recommended enhancement of 2 levels for the offense of mail fraud based on "the unauthorized transfer or use of any means of

identification." Sentencing Memorandum at 15. According to Gonzales, that section "prohibits the application of 'any specific offense characteristic for the transfer, possession or use of a means of identification when determining the sentence for the underlying offense' if a mandatory, consecutive sentence is not imposed for the offense of aggravated identity theft." Sentencing Memorandum at 15 (quoting § 2B1.6, cmt. n.2). Gonzales contends that "the rationale for this prohibition is that the sentence for aggravated identity theft already accounts for this offense conduct." Sentencing Memorandum at 15. Gonzales argues that, because he will receive a two-year consecutive sentence on the identity theft count (Count VI), "his sentence for the underlying offense is not eligible for a two-level increase for 'transfer, possession or use' of false identification." Sentencing Memorandum at 14-15.

Gonzales' fourth and final point under his second high-level argument is that the Court should depart or vary from the recommended guidelines sentence because, "many of the specific offense characteristics, such as the enhancements for sophisticated means and aggravated role, overlap and punish the same conduct." Sentencing Memorandum at 16. Gonzales refers to the concept of "factor creep" and refers to commentators that are "concerned that by 'piling on' multiple specific offense characteristics, the Guidelines are essentially punishing the defendant for the same conduct." Sentencing Memorandum at 16. Gonzales contends that, when a district court imposes multiple, similar enhancements, it may exercise its discretion to mitigate the enhancement's effect by making a downward departure. See Sentencing Memorandum at 17 (citing United States v. Lauersen, 348 F.3d at 344). Gonzales concedes that some of the enhancements that the Original PSR proposes may arguably apply, but asks the Court to depart or vary from the recommended guidelines sentence "because these enhancements over lap and essentially punish the same conduct." Sentencing Memorandum at 17. Gonzales asserts that a

departure or variance is warranted because of the unwarranted sentence disparity created by sentencing him based on the loss amount combined with four specific offense characteristics. See Sentencing Memorandum at 17. First, Gonzales argues that the sophisticated-means and aggravating role enhancements overlap, and second, he argues that empirical evidence demonstrates that "offenders who are subjected to sentencing under 2B1.1 based on the loss table and more than two specific offense characteristics are outliers who suffer unnecessarily based on 'factor creep.'" Sentencing Memorandum at 19-20. In Gonzales' view, any attempt to punish an offender like him "creates an unreasonable and unwarranted sentence disparity among similarly situated offenders" that the Court should seek to avoid under 18 U.S.C. § 3553(a). Gonzales explains:

> A recent review of sentences under section 2B1.1 by statisticians at the United States Sentencing Commission has found that the imposition of multiple sentencing enhancements in fraud and theft cases is relatively rare. This analysis has shown that for offenders sentenced under 2B1.1 in 2012, fifty percent of the defendants received an increase from the loss table and at least one other specific offense characteristic. (Courtney Semisch, Sentencing Symposium, 9/18/13, Tx., pp. 40)

> Of this sub-set of those one-third of the offenders who were sentenced under both the loss table and at least one other specific offense characteristic, 63.2% received an increase from the loss table and only one additional specific offense characteristic. Another 27.8% of these offenders received an increase from the loss table and two additional specific offense characteristics. Only 8% of this subset received an increase based on the loss table and three specific offense characteristics and only .9% received an increase from the loss table and four additional specific offense characteristics. (Courtney Semisch, Sentencing Symposium, 9/18/13, Tx., pp. 40-41)

> Mr. Gonzales contends that offenders who are subjected to sentencing under 2B1.1 based on the loss table and more than two specific offense characteristics are outliers who suffer unnecessarily based on "factor creep." He further submits that any effort to punish such an offender, like him, creates an unreasonable and unwarranted sentence disparity among similarly situated offenders which this Court should seek to avoid under 18 U.S.C. § 3553.

Sentencing Memorandum 19-20.

Gonzales then moves to his final high-level argument, asking the Court to depart or vary from the sentence the Guidelines recommend, based on Gonzales' unique history and characteristics. <u>See</u> Sentencing Memorandum at 20. Gonzales argues that, after the Court has calculated the applicable Guidelines range, it must make an individualized assessment based on all of the § 3553(a) factors to determine whether a departure or variance is warranted. <u>See</u> Sentencing Memorandum at 20. Gonzales further asserts that, through this inquiry, a district court can impose any sentence that is reasonable, as long as it fairly and fully considers all of the factors set forth in § 3553(a). <u>See</u> Sentencing Memorandum at 20 (citing <u>United States v. Cage</u>, 451 F.3d 585, 595 (10th Cir. 2006)). Gonzales asserts that, in his case, there are many aspects of his history and characteristics that mitigate this criminal offense, including: (i) he is a survivor of childhood trauma and abuse; (ii) he has struggled with depression and anxiety since he was a young adult, and has repeatedly sought treatment for his mental health disease; (iii) while he was imprisoned at the Utah State Penitentiary, he "did everything he could to improve his life, culminating in the receipt of a Bachelor's of Arts in accounting"; (iv) "[f]ollowing his release from prison on 2002, he successfully completed sex offender treatment, and was discharged from parole without a single violation and began a productive life as a bookkeeper and accountant"; (v) he married, started a family, and enjoyed a long period of rehabilitation; (vi) since law enforcement searched his residence in May, 2012, he has been doing everything in his power to forge a new life; and (vii) he has repeatedly cooperated with the United States, complied with all conditions of pre-trial release, and has undergone drug counseling. Sentencing Memorandum at 22-23.

## 2.     The Addendum and Re-disclosure of the PSR.

On November 20, 2014, in response to Gonzales' Sentencing Memorandum, the USPO filed an Addendum to the PSR, specifically addressing the eight objections Gonzales raises.  See Addendum to the Presentence Report, filed November 20, 2014 ("Addendum").  Regarding Gonzales' objection to paragraph 68, the USPO maintains that the intended loss amount of $1,317,411.00 should be used to increase Gonzales' base offense level by 16 levels.  See Addendum at 1.  The USPO further asserts that Gonzales is incorrect that, if the Court uses the intended loss, he is entitled to a 3-level reduction for an attempted theft.  See Addendum at 1.  The USPO states that, the Court must "pursuant to USSG §3D1.3(b), in the case of counts grouped together under this section, when two counts involve offenses of the same general type to which different guidelines apply, apply the offense guideline that produces the highest offense level."  Addendum at 1.  It argues that, in this case, "only Count 1, is a Conspiracy, which would be covered under USSG §2X1.1 (Attempt, Solicitation, or Conspiracy Not Covered by a Specific Offense Guideline).  Counts 2 through 5 are specifically covered under USSG §2B1.1, which was used throughout the Presentence Report as the applicable guideline."  Addendum at 1-2.

The USPO counters Gonzales' argument that there were only three victims in this federal offense, resulting in no specific offense characteristic application under § 2B1.1(b)(2)(B).  See Addendum at 2.  According to the USPO, application note 4(E) to §2B1.1 states that, in a case involving means of identification, "a victim means (i) any victim as described in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority."  Addendum at 2.  The USPO asserts that, here, "at least 107 victims were identified whose information was possessed without permission or knowledge and without legal authority to further the scheme perpetrated by the defendant and his co-conspirator."  Addendum at 2.

Regarding Gonzales' third objection, the USPO maintains that an enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C) is warranted. See Addendum at 2. According to the USPO, under Application Note 9(B), sophisticated means "is defined as an especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" and that "[n]o consideration is made for the amount of loss. . . ." Addendum at 2.

The USPO agrees with Gonzales that "the application of the SOC[1] pursuant to USSG §2B1.1(b)(11)(C)(i), was applied incorrectly." Addendum at 2. The USPO explains:

> Review of the above noted Application note specifically indicates that if a Sentence for Aggravated Identity Theft is imposed in conjunction with a sentence for an underlying offense, the SOC for transfer, possession, or use of a means of identification should not be applied. It should be noted, that although this specific application note prohibits the use of the SOC pursuant to USSG § 2B1.1(b)(11)(C)(i), it does not prohibit the use of all SOCs that are based on the transfer, possession, or use of a means of identification, and thus are not forbidden. The PSR will be re-disclosed to reflect those changes.

Addendum at 2. Regarding Gonzales' argument that he should not be subjected to an aggravated role adjustment as an organizer or leader of criminal activity that involved five or more participants under § 3B1.1(a) because this enhancement substantially overlaps with and is taken into account by § 2B1.1(b)(1), the USPO responds that the SOC should apply, because § 3B1.1 does not reflect that the amount of loss has any bearing on Gonzales' role under this enhancement. See Addendum at 2. The USPO next addresses Gonzales' sixth and seventh objections, which ask for downward departures based on his mental health, physical condition, gambling abuse, and cooperation with law enforcement, and for his post-offense rehabilitation efforts. See Addendum at 2. The USPO maintains that a departure is unwarranted based on the information that the Original PSR sets forth in paragraphs 134 and 135. See Addendum at 2. Finally, the USPO rejects Gonzales' contention that "a downward departure or variance based on

---

[1]The parties use the term "SOC" as a shorthand for "specific offense characteristic."

his cooperation with law enforcement following his arrest and his Post Offense Rehabilitation efforts is appropriate." Addendum at 2.

In light of the fact that the USPO agreed with Gonzales regarding his fourth objection, it re-disclosed the PSR on November 25, 2014. See PSR at 1. The PSR explains that Counts 1 through 6 are grouped for guideline calculation purposes, but that Count 6 is treated separately as the statute mandates imposition of a consecutive sentence. See PSR at 20. The PSR identifies the base level offense for the group, under § 2B1.1, as seven. See PSR ¶ 67, at 21. It then increases the offense level by 16 under § 2B1.1(b)(1)(1), because the intended loss exceeds $1,000,000.00. See PSR ¶ 68, at 21. The PSR also imposes: (i) a 4-level increase under § 2B1.1(b)(2)(B), because the offense involved fifty or more victims; (ii) a 2-level increase under § 2B1.1(b)(10)(C), because the offense involved sophisticated means; and (iii) a 4-level increase under § 3B1.1(a), because Gonzales was an organizer or leader of criminal activity that involved five or more participants, or was otherwise extensive. See PSR ¶¶ 69-72, at 21. After decreasing the offense level 3 levels because Gonzales accepts responsibility and assisted authorities in his investigation or prosecution, the PSR states that Gonzales' total offense level is 30. See PSR ¶¶ 76-78, at 21. Based on Gonzales' criminal history, the PSR assigns him a criminal history category of II. See PSR ¶ 83, at 23. The PSR concludes that, "[b]ased on a total offense level of 30 and a criminal history category of II, the guideline imprisonment range is 108 months to 135 months." PSR ¶ 115, at 31. The PSR also explains that, pursuant to 18 U.S.C. § 3663A, restitution in the amount of $804,735.73 "shall be ordered in this case for both defendant's [sic] to be paid jointly and severally." PSR ¶ 128, at 33.

3. **The Sentencing Hearing**.

The Court held a sentencing hearing on December 4, 2014. See Transcript of Hearing (taken December 4, 2014)("Tr.").[2] Gonzales began by addressing his objection to paragraph 68 that the USPO should have used actual loss, rather than potential or intended loss. See Tr. at 3:1-5 (Court). Gonzales stuck to his briefing on this objection, but eventually conceded that there is no relief within the Guidelines, and that the proper avenue is to use a variance. See Tr. at 6:8-12 (Court, Pori). The United States agreed that the Guidelines were properly applied on Gonzales' first objection, and that if there is an argument, it must be pursued through the § 3553(a) factors. See Tr. at 6:16-7:8 (Court, Neda). The Court stated that it was inclined to overrule Gonzales' objection to paragraph 68, largely for the reasons that the USPO sets forth in the Addendum. The Court explained:

> It seems to me that it's appropriately calculated and the argument is more in the nature of Kimbrough[3] or in addition to Kimbrough. It's also asking for some variance, because of the way it operates, and I'm inclined to overrule that objection, and treat it more in the nature of a request for a variance after we calculate the guidelines correctly.

Tr. at 8:3-14 (Court).

---

[2]The Court's citations to the December 4, 2014 transcript refer to the court reporter's original, unedited version. Any final version may contain slightly different page and/or line numbers.

[3]Kimbrough v. United States, 552 U.S. 85 (2007), established that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the guidelines." 552 U.S. at 101 (alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008).

The Court then moved to Gonzales' second objection -- that there were only three victims in this case, rather than the fifty or more that the USPO calculates in the PSR.  See Tr. at 8:15-18 (Court).  Gonzales again reiterated his arguments from the briefing.  See Tr. at 8:19-10:17 (Court, Pori).  The Court asked, however: "[I]f you just had the application note 4E, would you agree we should count any individuals whose means of identification was used unlawfully or without authority."  Tr. at 10:18-21 (Court).  Gonzales responded: "If I just had 4E yes, if I didn't have application note 2B1.6 and if Mr. Gonzales was not facing a sentence of two years consecutive for aggravated identity theft[.]"  Tr. at 10:22-25 (Pori).  The United States emphasized that there are two different considerations at play: the harm done, and the breadth of the crime.  See Tr. at 11:5-25 (Neda).  It asserted that here there are 109 "actual people who are receiving incidentally letters from the IRS demanding that taxes be paid . . . for the insurance benefits that they've received over the past few years."  Tr. at 11:7-12 (Neda).  According to the United States, Gonzales' cited application note refers does not deal with the breadth of the crime and how many true identities Gonzales unlawfully used.  See Tr. at 11:21-12:21 (Neda). Gonzales countered that the information about individuals receiving letters is not part of the PSR and is therefore not properly before the Court.  See Tr. at 14:4-16 (Pori).  He further asserted that these individuals have never had actual harm, and that he is unable to see how it is not double counting to enhance the sentence because there were many victims of identity theft, and then sentence him to a mandatory consecutive term of two years because of identity theft.  See Tr. at 14:14-23 (Pori).  The Court concluded:

> Well, this may create a problem down the road, but I think that the more specific language of 4E at least for the purpose of determining victims controls here over the general definition of victim which applies to B 1, and here we're dealing with B 2.  So I'd be inclined to overrule that objection and deal with the other objection when we get to 2B1.6.

Tr. at 19:3-10 (Court).

The Court then moved to objection number 3 and objection number 5. See Tr. at 19:11-18 (Court, Pori). Gonzales conceded that he did not think that anyone could argue that this offense did not involve sophisticated means, or that it did not involve leading or managing more than five people. See Tr. at 19:19-23 (Pori). He admitted that "I think enhancements under the facts do apply," Tr. at 19:17-23 (Pori), but asserted that he thinks that he has "a very good argument when it comes to considering this kind of variance based on substantially overlapping specific offense characteristics," Tr. at 21:17-20 (Pori). The United States maintained that: (i) this crime was a sophisticated scheme involving significant planning, and the creation of companies and 107 fake identification cards; and (ii) that there were five or six people involved, which the Guidelines punish more severely because conspiracies create more danger and crimes. See Tr. at 21:22-25:2 (Neda). The Court concluded:

> Well, I think that on the facts that are in the PSR, it does appear that the defendant used sophisticated means, and that he did manage others or was a leader or organizer, so I think the guidelines are correctly calculated. I am concerned about the statistics the defendant is presenting about how few of these have more than one enhancement. This one seems to have a lot. But I think that goes more for a Kimbrough or variance argument, but I think the guidelines were correctly calculated here.

Tr. at 26:3-16 (Court).

The parties confirmed that objection number 4 should be sustained. See Tr. at 26:13-24 (Court, Pori). Gonzales then asked the Court to take judicial notice of the case of the former head of the New Mexico State Senate -- Manny Aragon -- who received a sentence of 67 months for conspiring with five other people to defraud the State of New Mexico of $2 million in the construction of the courthouse in Albuquerque. See Tr. at 28:17-30:3 (Court, Pori). The parties further confirmed that the Court had dealt with all of Gonzales' objections, and they then moved

to the requested downward departure based upon mental and emotional health, and on physical addiction including drug or alcohol abuse. See Tr. at 28:14-16 (Court). The parties largely stuck to their briefing, and the Court denied the request for any departure from the Guidelines. See Tr. at 30:15-35:19 (Court, Neda, Pori). The Court explained that, while the Guidelines certainly authorize departures for mental and emotional health under § 5H1.3, and for physical addiction, including drug or alcohol abuse, under § 5H1.4, it does not think that they are warranted under the facts of this case. See Tr. at 35:12-19 (Court). The Court acknowledged that Gonzales has these problems, but noted that he was also operating at a fairly high level and was able to commit a sophisticated crime. See Tr. at 35:19-23 (Court). The Court observed that it must sentence many people with mental, emotional, physical health problems or addictions, but it thinks that this case fits into the heartland of cases. See Tr. at 35:23-36:8 (Court). The Court stated that, even if a departure were warranted under the facts, it would exercise its discretion not to depart, "because in my view this case remains a heartland case." Tr. at 36:11-14 (Court). The Court noted, however, that it thinks that these factors are relevant to the § 3553(a) variance analysis and that it would keep these arguments in mind in fashioning a sentence to reflect those factors. See Tr. at 36:15-19 (Court).

The Court and the parties spent the remainder of the hearing discussing the § 3553(a) factors. See Tr. at 37:5-55:16 (Court, Neda, Pori). The parties largely re-asserted their arguments set forth in the briefing. See Tr. at 37:5-55:16 (Court, Neda, Pori). Gonzales suggested that, if the Court were to sentence Gonzales based on the loss amount and the aggravated identity theft, he would be facing a sentence of approximately five years. See Tr. at 43:16-20 (Pori). Instead, according to Gonzales, he faces eleven years, "twice as much sentence based upon specific offense characteristics that were not alleged in the indictment, admitted by

Mr. Gonzales, proven beyond a reasonable doubt, even proven by more than a preponderance of the evidence . . . ." Tr. at 43:20-25 (Pori). Gonzales contended that to sentence him on the basis of so many specific offense characteristics that substantially overlap would result in a an unreasonable sentence that is more severe than necessary to achieve Congress's sentencing aims. <u>See</u> Tr. at 43:25-44:6 (Pori). Moreover, Gonzales suggested that the Court impose a total sentence of 81 months. <u>See</u> Tr. at 46:13-47:10 (Court, Pori). The United States opposed a variance under the § 3553(a) factors, because: (i) although, after being arrested, Gonzales gave consent for a search of his thumb drives and computer, nothing of evidentiary value was found at that point; (ii) although Gonzales has expressed remorse, the 3-level reduction for acceptance of responsibility addresses it; (iii) although Gonzales offered to debrief, the United States Postal Service agents did not find it helpful, because the only thing he told them was that Post Office Boxes and debit cards can be misused; (iv) when Gonzales was not even an adult, he was convicted of heinous crimes -- burglary and rape -- for which he served time; (v) although he earned a bachelor's degree in accounting, he used it to steal individuals' identities, because he had access to their personal files; (vi) although he has a daughter who will suffer, most defendants have children or spouses who will suffer; (vii) he had an education, caring family, and everything else required to live a respectable life; and (viii) this crime was a deliberate, long-term, repeated, criminal episode that imperiled the system designed to help those much more needy. <u>See</u> Tr. at 47:13-50:19 (Neda).

The Court then stated the sentence. <u>See</u> Tr. at 55:17-70:24 (Court, Neda, Pori). The Court explained that, after considering Gonzales' objections and overruling them, it would "adopt those in the presentence report as its own including in the addendum which had that one objection that was sustained." Tr. at 55:17-70:24 (Court). The Court stated that the offense level

is therefore 30 and the criminal history category is II, producing a guideline imprisonment range of 108 to 135 months on counts one through five. See Tr. at 56:8-12 (Court). The Court further explained that, as to count 6, "the guideline sentence is the statutorily required [sentence] of 24 months [--] two years [--] which will run consecutively to any sentence imposed[.]" Tr. at 56:12-14 (Court). The Court explained that it has identified roughly eleven factors that put downward pressure on the sentence: (i) although the Court has no Kimbrough disagreement with the Guidelines advisory range, the actual loss here is considerably below the intended loss, only three governmental agencies are sustaining actual losses in this case, and although this criminal enterprise qualifies as sophisticated under the Guidelines, in reality, it would have probably been discovered eventually; (ii) Gonzales seems to be a good father and he has a seven-year-old daughter; (iii) Gonzales was able to use rehabilitation in the past to gain skills, including a college education, and benefit from it; (iv) that the recommended Guidelines range in this case is higher than other people who have maybe done more harm in fraud or embezzlement cases; (v) the need for the sentence to not be greater than necessary; (vi) Gonzales' mental and emotional health -- the Court can use conditions of supervised release, rather than incarceration, to address these problems; (vii) Gonzales' physical conditions, including alcohol and drug abuse; (viii) that Gonzales cooperated with law enforcement following his arrest, offered to debrief, and that he pled guilty before Archuleta, which may have contributed to Archuleta pleading guilty; (ix) Gonzales' post-arrest rehabilitative efforts; (x) that there is a sentencing disparity with other defendants who have similar records; and (xi) supervised release can go a long way in serving as an alternative to longer imprisonment; the Court might be able to substitute supervised release for incarceration, and use supervised release to deal with Gonzales' drug and alcohol problems. See Tr. at 58:16-61:4 (Court).

The Court explained, however, that nine factors put upward pressure on the sentence and counsel that the Court keep it within the Guidelines range.  See Tr. at 61:1-4 (Court).  According to the Court, these include: (i) this federal offense is a serious one, involving the taking of enormous amounts of public money; (ii) the sentence must reflect the actual loss here and the seriousness of the offense; (iii) the sentence must promote respect for the law; (iv) Gonzales has a criminal history, which involves burglary and rape; (v) the sentence must afford adequate deterrence -- both at the specific and general level; (vi) there is a need to protect the public from Gonzales; (vii) Gonzales rehabilitated during his last incarceration, but used that rehabilitation to then commit this federal offense; (viii) there is a need to avoid unwarranted sentencing disparities; and (ix) the sentence must be sufficient to reflect the § 3553(a) factors.  See Tr. at 61:5-62:12 (Court).  Based on the balance of the factors, the Court explained that it would reduce Gonzales' sentence by the equivalent of a couple of levels, explaining:

> I think that the downward pressures slightly outweigh the [upward] pressures[.]  I do think that Mr. Gonzales is compar[ed] to Mr. Archuleta . . . more culpable although they played different roles and I think his sentence should be greater than Mr. Gonzales.  I guess I'm using in my mind a variance of about equivalent of two offense levels down to about 28.  And I could go and do a 27, which would be equal with Archuleta and Mr. Gonzales if I did that I would be inclined to sentence at the high end of the range . . . which would be 97 months plus the 24 at 121.  But I think it may be better to only reduce it a couple of offense levels and sentence at the 87 months plus 24 which would produce a range of 111. . . . I think in this case that's adequate to ensure a sentence that is greater what Mr. Archuleta will receive but it also reflects [m]y assessment that Mr. Gonzales is somewhat more culpable in this case.

Tr. at 62:12-63:7 (Court).

The Court therefore varied the guidelines sentence by the equivalent of 2-levels on Counts one through five, and imposed a sentence of 87 months.  See Tr. at 63:8-64:18 (Court).  As to Count six, the Court sentenced Gonzales to a term of imprisonment of 24 months.  See Tr. at 64:18-20 (Court).  The Court explained that "[s]aid terms shall run consecutively for a total of

111 months[.]" Tr. at 64:20-21 (Court). The Court also imposed a three-year term of supervised release on Counts one through five, and a concurrent one-year term of supervised release on Count 6, for a total term of three years. See Tr. at 64:23-65:6 (Court). Finally, regarding restitution and a fine, the Court explained:

> Pursuant to the Mandatory Restitution Act, it is further ordered that the defendant will make restitution to the Texas Work Force Commission in the amount of 68,699.73, the Colorado Department of Labor in the amount of 488,107 dollars, and the New Mexico Department of Work Force Solutions in the amount of 247,920, for a total amount of 804,735.73,[4] to be paid jointly and severally by the defendant as well as the co-defendant. Restitution shall be submitted to the Clerk of the Court, attention intake, 333 Lomas Boulevard, Northwest, Suite 270, Albuquerque, New Mexico, 87102, to then be forwarded to the victims. The restitution will be paid in monthly installments of not less than $150, 50 dollars per victim, or 20 percent of the defendant's gross monthly household income, whichever is greater. Restitution payments are to be mailed to the Colorado Department of Labor and employment investigation in criminal enforcement, 633, 17th street suite 900, Denver Colorado, 80202 The New Mexico Department of Work Force Solutions, fraud collections P.O. Box 2281, Albuquerque, New Mexico, 87103. And Texas Work Force Commission, Revenue and Trust Management, P.O. Box 149352, Austin Texas, 78714-9352.

> Based on the defendant's lack of financial resources, the Court will not impose a fine. The defendant shall pay a special assessment of $100 as to each count of conviction for a total of $600, which is due immediately.

Tr. at 69:7-70:11 (Court).

> Before imposing the sentence, Gonzales made the following objections:

> I appreciate the variance but I do want to at this point note our objections that the sentence would be procedurally and substantively unreasonable and the additional objection that we do not believe that sex offender treatment is reasonably related to the offense of conviction so we would object to that condition of supervised

---

[4]Gonzales did not object to the PSR's recommendation that restitution be imposed in the briefing or at the sentencing hearing. The PSR thoroughly documents the Texas Workforce Commission's, the Colorado Department of Labor and Employment's, and New Mexico Department of Workforce Solutions' losses in this case. See PSR ¶¶ 11-59, at 6-19. The New Mexico Department of Workforce Solutions suffered actual losses of $247,929.00, the Colorado Department of Labor and Employment suffered actual losses of $488,107.00, and the Texas Workforce Commission suffered actual losses of $68,699.73, for a total actual loss amount of $804,735.73. See PSR ¶¶ 128-129, at 33.

release.

Tr. at 70:17-24 (Pori).  The Court sustained the objection to the sex offender condition, but overruled the objection that the sentence would be procedurally and substantively unreasonable. See Tr. at 70:25-73:12 (Court).

## **RELEVANT LAW REGARDING THE GUIDELINES**

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section

> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th

Cir. 2008). This presumption, however, is an appellate presumption and not one that the trial court can or should apply. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[5] Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

_____

[5]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory. Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory [.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14,

---

Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002 JB, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

2010)(Browning, J.).  On the other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011

WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service

was not present to an unusual degree and, thus, did not warrant a departure, the Court found that

a variance was appropriate, because the defendant's military service was "superior and uniformly

outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he

served with distinction."  2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court reaffirmed the

principle that it is permissible for sentencing judges "to exercise discretion -- taking into

consideration various factors relating both to offense and offender -- in imposing judgment

within the range prescribed by statute."  530 U.S. at 481.  The Supreme Court cautioned,

however, that the Constitution of the United States limits this discretion and its Sixth

Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the

penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and

proved beyond a reasonable doubt."  <u>Apprendi v. New Jersey</u>, 530 U.S. at 490.  In <u>Blakely v.

Washington</u>, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in <u>Apprendi v.

New Jersey</u>, stating that the "statutory maximum for <u>Apprendi</u> purposes is the maximum

sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or

admitted by the defendant."  542 U.S. at 303 (emphasis omitted)(citations omitted)(internal

quotation marks omitted).  In <u>United States v. Booker</u>, the Supreme Court held that, because the

sentencing guidelines are no longer mandatory, "<u>Apprendi</u> does not apply to the present

advisory-Guidelines regime."  <u>United States v. Ray</u>, 704 F.3d 1307, 1314 (10th Cir. 2013).

<u>See</u> <u>United States v. Booker</u>, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines

statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations omitted)(internal quotations marks omitted)). The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement findings analysis. See 408 F.3d at 684-85. United States v. Magallanez involved plain error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines. See United States v. Magallanez, 408 F.3d at 682. The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months. See United States v. Magallanez, 408 F.3d at 682-83. The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made the Guidelines ranges "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are

still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[6] "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only

---

[6]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[7](holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court has noted:

> The Court explained that, although the decision of the Supreme Court of the United States in Alleyne v. United States, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from Apprendi v. New Jersey, 530 U.S. 466 . . . (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum

---

[7]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Hendrickson, United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009), United States v. Banda, 168 F. App'x 284 (10th Cir. 2006), United States v. Schwartz, 408 F. App'x 868, 870 (6th Cir. 2010), United States v. Quinn, 566 F. App'x 659, 670 (10th Cir. 2014), and United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M.

Nov. 3, 2014)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt. 1(H). In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

(1)  (A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

  (B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly

undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v.

United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge. The defendant in <u>Witte v. United States</u> had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and a 1991 attempt to import marijuana. <u>See</u> 515 U.S. at 392-93. In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics. <u>See</u> 515 U.S. at 392-93. At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes. <u>See</u> 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities. <u>See</u> 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense. <u>See</u> 515 U.S. at 395. The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States provides. <u>See</u> 515 U.S. at 395. The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct." <u>United States v. Witte</u>, 25 F.3d 250, 258 (5th Cir. 1994). In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including the Tenth Circuit's, that had previously considered

this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  See 519 U.S. at 149.  In reaching its result, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began

its analysis in with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661).  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of

using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d at 1510, the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of

the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison.  See 11 F.3d at 1515.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, No. CR 14-0259, 2014 WL 6065657, at *14-15 (D.N.M. Nov. 3, 2014)(Browning, J.)(cross referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court has previously held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal.  See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. Feb. 13, 2012)(Browning, J.).  The Court has also determined that, although it could consider the

defendant's silence about information regarding herself or others engaging in criminal conduct, it would not rely on that silence to increase the defendant's sentence. See <u>United States v. Chapman</u>, No. CR 11-0904 JB, 2012 WL 257814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.). Finally, the Court has concluded that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. <u>United States v. Romero</u>, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).

## RELEVANT LAW REGARING LOSS CALCULATION UNDER U.S.S.G. § 2B1.1

Section 2B1.1 of the United States Sentencing Guidelines guides a court when sentencing a defendant for "Larceny, Embezzlement, and other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." U.S.S.G. § 2B1.1. Part of a court's duty when sentencing under § 2B1.1 is to determine whether a defendant's base offense level should be increased because of the amount of loss the offense caused. See U.S.S.G. § 2B1.1(b)(1) ("If the loss exceeded $5,000, increase the offense level as follows . . . ."). "The court need only make reasonable estimate of the loss." U.S.S.G. § 2B1.1, Application Note 3(C). The Sentencing Guidelines neither proscribe, nor prohibit, a methodology for a court to use when calculating the "reasonable estimate" of the loss a defendant's conduct caused. See <u>United States v. Erpenbeck</u>, 532 F.3d 423, 433 (6th Cir. 2008)(rejecting a defendant's argument that the entire value of collateral that he pledged for a legitimate loan should be used to off-set his fraudulent transactions and holding that the collateral should be reduced pro-rata based upon the ratio of the fraudulent transactions to the underlying, legitimate loan).

Loss is "the greater of actual or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.SG. § 2B1.1, Application Note 3(A)(i). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(ii). "Offense" within the definition of either actual or intended loss refers to a defendant's relevant conduct, as determined by § 1B1.3. See United States v. Holbert, 285 F.3d 1257, 1261, 1261 n.3 (10th Cir. 2002)(explaining that the Sentencing Guidelines explicitly differentiate between the terms "offense of conviction," which "encompasses only facts immediately related to the specific offense for which the defendant was convicted," and "offense," which "'means offense of conviction and all relevant conduct,'" and that, "[w]hen the Sentencing Commission intends to limit the applicability of a victim-related enhancement" to the offense of conviction "it does so explicitly" (quoting U.S.S.G. § 1B1.1, Application Note 1(H)); Robert W. Haines, Jr., Frank O. Bowman III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook § 2B1.1, § 5, at 335 (2012-13 ed.)("Guidelines Handbook")(explaining that the Commission intended for the meaning of "offense" to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3 and that the omission of a cross-reference to § 1B1.3 in the application notes to § 2B1.1 is of no "substantive significance," because "the drafters apparently felt that the cross-reference to § 1B1.3 was unnecessary because the relevant conduct rules apply to all offense types"). Additionally, "the Commission makes clear that a loss that 'resulted from' an offense is one that would not have occurred but for the occurrence of the offense," but a defendant's liability is limited to those losses "foreseeable to a reasonable person." Guidelines Handbook § 5, at 334 (emphasis in original)("The loss definition in 2B1.1 . . . insists, as a minimum, that the defendant's offense have been a cause-in-fact of the economic harm at issue.").

When the loss amount is disputed, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence. See Guidelines Handbook § 14, at 353. The Tenth Circuit has, accordingly, ruled that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012). Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence." United States v. Kieffer, 681 F.3d at 1168 (citing United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002)). For example, in United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814 (D.N.M. June 22, 2012)(Browning, J.), the Court determined that an enhancement pursuant to § 2B1.1(b)(1) was unwarranted, because, although the United States contended that a New Mexico Corrections Department facilities manager awarded four million dollars' worth of state government contracts to a developer in exchange for bribes, the United States submitted no evidence regarding the profit, if any, the developer received from the contracts. See 2012 WL 2574814, at *1, *9-10. The Court noted that, without "evidence regarding the value of the benefit Moya received under these government contracts, the United States cannot establish by a preponderance of the evidence that an . . . enhancement is appropriate" under § 2B1.1(b)(1). 2012 WL 2574814, at *10.

The application notes to § 2B1.1 provide that a court shall reduce the loss by certain credits. First, the court shall reduce the loss by the "money returned, and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1,

Application Note 3(E)(i). "[W]hen no actual sales price is available to calculate loss, the Guidelines permit a district court 'to *estimate* loss based on *available* information.'" United States v. Snow, 663 F.3d 1156, 1161 (10th Cir. 2011)(quoting United States v. James, 592 F.3d 1109, 1116 (10th Cir. 2010))(emphasis in United States Snow but not in United States v. James)(internal quotation marks omitted). See United States v. Merriman, 647 F.3d 1002 (10th Cir. 2011)("[T]he Guidelines permit a reduction for restoring victims' losses prior to the onset of any government involvement, . . . not . . . when payments are not returned to the victims until after the crime has been discovered by the government and the defendant has . . . motivation to use his ill-gotten gains as leverage . . . ."). The application notes indicate that value returned should be credited against the losses that the victim who received the value suffered, and not against a lump sum of total losses where there are more than one victims: for example, in a case involving a Ponzi or other fraudulent investment scheme, value which one investor receives in excess of that investor's principal investment "shall not be used to offset the loss to another individual investor in the scheme." U.S.S.G. § 2B1.1, Application Note 3(F)(iv).

Second, the court shall reduce the loss, in "a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral," or if the collateral has not been disposed of by sentencing, "the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1, Application Note 3(E)(ii). As the Tenth Circuit has explained, "actual loss should be measured by the net value, not the gross value, of what was taken when the defendant pledged collateral to secure a fraudulent loan." United States v. Snow, 663 F.3d at 1161. "Where a lender has foreclosed and sold the collateral, the net loss should be determined by subtracting the sales price from the outstanding balance on the loan." United States v. Washington, 634 F.3d 1180, 1184

(10th Cir. 2011)(citing <u>United States v. James</u>, 592 F.3d at 1114). Collateral may not be used to offset losses, however, if the defendant "'intended to permanently deprive the creditor of the collateral through concealment.'" <u>United States v. Schild</u>, 269 F.3d 1198, 1201-02 (10th Cir. 2011)(quoting <u>United States v. Nichols</u>, 229 F.3d 975, 979 (10th Cir. 2000)(holding that a defendant convicted of bank fraud may not receive an offset to the loss his offense incurred based on the cattle he pledged as collateral where he sold the cattle, and, thus, the bank could not levy thereon). Additionally, Application Note 3(E)(ii) "cannot reasonably be interpreted as limiting credits to collateral for which the defendant is himself the pledger"; rather, collateral pledged reduces a victim's losses irrespective of which defendant, if there are multiple, pledged the collateral. <u>Guidelines Handbook</u> § 10, at 345 ("The bank suffered only one actual financial loss arising from the concerted action of the two defendants -- a loss objectively measurable by subtracting the value of the collateral from the amount of the loan."). "A court may properly accept a variety of kinds of evidence about the value of the collateral pledged by the defendant, and it need not determine that value to the penny." <u>Guidelines Handbook</u> § 14, at 353.

### <u>LAW REGARDING THE USE OF "SOPHISTICATED MEANS" TO COMMIT FRAUD</u>

U.S.S.G. § 2B1.1(b)(10)(C) provides that, "[i]f the offense involves sophisticated means, increase by 2 levels. If the resulting offense is less than level 12, increase to level 12." U.S.S.G. § 2B1.1(b)(10)(C). Application Note 8 provides, "[f]or the purposes of subsection (b)(2), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1, cmt. n.8(B).

"The possession of false document-making implements may constitute sophisticated means, as may creation of numerous false documents, even if the documents were easily generated and contained only simple falsehoods." Guidelines Handbook §27, at 390. The Tenth Circuit first addressed the enhancement for sophisticated means in the commission of tax evasion in United States v. Rice, 52 F.3d 843 (10th Cir. 1995).[8] In United States v. Rice, the defendant received a "tax refund based on excessive withholding that was never in fact withheld." 52 F.3d at 845. The district court applied the sophisticated-means enhancement, "in part because [the defendant] contested the IRS' ability to require him to produce documents during the civil phase of his case." 52 F.3d at 849. The Tenth Circuit held that the defendant's tax evasion scheme was not sophisticated, because it was "the functional equivalent of claiming more in itemized deductions than actually paid." 52 F.3d at 849. In so holding, the Tenth Circuit noted that, if the defendant's scheme was sophisticated, then "every fraudulent tax return will fall within that enhancement's rubric." United States v. Rice, 52 F.3d at 849. In United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999), the Tenth Circuit found that the district court's application of the sophisticated-means enhancement was appropriate, even though the defendant did not use a sham corporation or offshore bank accounts. See 199 F.3d at 1158. The defendant in United States v. Guidry made her embezzlement particularly difficult to detect by using checks that were made payable to a bank, not herself, which are harder to trace, by only depositing a small fraction of her embezzled funds in a bank, which made her embezzlement difficult for the IRS to investigate, and by never withdrawing more than $10,000.00 in one day, which demonstrated that she knew that depositing any more would require the bank to notify the IRS of the deposit,

---

[8]The Sentencing Guidelines' enhancement for the use of sophisticated means in the commission of offenses falling under U.S.S.G. § 2B1.1 and U.S.S.G. § 2T1.1 are identical, save for the explanatory examples provided for applying the enhancement under U.S.S.G. § 2B1.1. Compare U.S.S.G § 2B1.1, cmt. n.8(B), with U.S.S.G. § 2T1.1, cmt. n.4.

and thus further demonstrated that she understood how to use sophisticated means to conceal her embezzlement.  See 199 F.3d at 1158.  The Tenth Circuit held that using multiple storage units to hold items purchased with embezzled funds had a similar effect, and that her case was not simply one of representing to have paid withholding taxes not paid or not disclosing one's income.  See United States v. Guidry, 199 F.3d at 1158 (citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d 279, 282 (5th Cir. 1993)).

The Tenth Circuit has upheld the application of a sophisticated-means enhancement to a defendant who conducted seminars on avoiding tax liability and "assisted in the preparation of tax returns that were false and fraudulent as to a material matter."  United States v. Ambort, 405 F.3d 1109, 1113 (10th Cir. 2005).  In United States v. Ambort, the Tenth Circuit found that there was ample evidence in the record to support a sophisticated-means enhancement, because the defendant's program was designed to provide a basis that someone could later articulate as to why they were entitled to the tax status they advanced and included discussions about what information should not be included in tax forms to avoid traceability.  See 405 F.3d at 1120.

In United States v. Snow, the Tenth Circuit held that a district court properly applied an enhancement for the use of sophisticated means under U.S.S.G. § 2B1.1, where the defendant "did not undertake to execute or conceal merely a single fraudulent transaction using false documentation but orchestrated a vast and complex fraud scheme in which he participated in over forty fraudulent mortgage-related transactions to defraud at least twelve different financial institutions."  663 F.3d at 1163.  The Tenth Circuit determined that the defendant's fraudulent scheme was complex, because of the lengths which the defendant took to execute the fraud, and also because the defendant successfully deceived numerous financial institutions and title companies, indicating that he necessarily used sophisticated mean to "fool trained and

experienced bank and closing personnel." 663 F.3d at 1163. That the defendant provided, and directed others to provide, fraudulent documentation and information sufficient to deceive the personnel reviewing it, procured and instructed others to procure cashiers' checks to disguise the true source of his income, and circulated and instructed others to circulate funds through different bank accounts to avoid detections indicated that he used sophisticated means. See 663 F.3d at 1163. With these facts, the Tenth Circuit determined that the district court properly applied a sophisticated means enhancement to the defendant's sentence under U.S.S.G § 2B1.1. Similarly, in United States v. Tilga, 824 F. Supp. 2d 1295 (D.N.M. 2011)(Browning, J.), the Court found that an enhancement for the defendant's use of sophisticated means was warranted where the defendant used offshore accounts and shell companies to evade taxes by hiding the amount of money she earned. See 824 F. Supp. 2d at 1330-34. The Court explained that the application notes to the sentencing guidelines regarding the use of sophisticated means recognizes that the enhancement applies because of the inherent complexity of the entities a defendant uses, and not because a defendant used the entities "in an especially complex or novel manner." 824 F. Supp. 2d at 1330-31. Moreover, the Court explained that the case law addressing the use of sophisticated means does not require that a defendant create the sophisticated means, but rather, "[t]here is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement." 824 F. Supp. 2d at 1332.

Additionally, the United States Court of Appeals for the Sixth Circuit has upheld the imposition of a sophisticated-means enhancement where the defendant created and used fictitious trusts to hide assets from the Internal Revenue Service, even though the defendant was not a sophisticated businessman and no offshore trusts were involved. See United States v.

Schwartz, 408 F. App'x 868, 870 (6th Cir. 2010)(unpublished). The United States Court of Appeals for the Seventh Circuit, in United States v. Minneman, 143 F.3d 1274 (7th Cir. 1998), held that the use of multiple corporate names and the placement of funds in a trust account both constitute complex efforts to hide income. See 143 F.3d at 1283.

## LAW REGARDING U.S.S.G. § 3B1.1 AGGRAVATING ROLE ENHANCEMENTS

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's offense level based on a defendant having played an aggravating role in the offense. Section 3B1.1 of the Sentencing Guidelines provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> **(a)** If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> **(b)** If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> **(c)** If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 Application Note 1.

Among the factors a sentencing court should consider when weighing an aggravating role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 Application Note 4.  The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'"  United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)).  See United States v. Vigil, 998 F. Supp. 2d 1121, 1155 (D.N.M. 2014)(Browning, J.)(refusing to find that nurse practitioner, who was illegally distributing controlled substances, was a leader or organizer even though she was essential to the success of the drug trafficking scheme).  "'A defendant's participation in illegal but lower-level activities,' however, 'will not support application of the enhancement.'"  United States v. Vigil, 998 F. Supp. 2d at 1144-45 (quoting United States v. Sallis, 533 F.3d at 1223).  Nevertheless, "[a] defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant."  United States v. Damato, 672 F.3d 832, 847 (10th Cir. 2012).

The Tenth Circuit, in the context of conspiracies to distribute illegal drugs, has also

identified several factors which might indicate that a defendant exercised the requisite control over others, including that: other sellers worked for him, were recruited by him, or had their activities controlled by him; "he paid others for their efforts on behalf of the conspiracy;" "he restricted the people to whom other coconspirators could sell their drugs;" and "he controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds."  United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995)(listing similar factors).

United States v. Sallis, 533 F.3d at 1223.  Neither "a 'role as a supplier of drugs to others, standing alone,'" nor "supplying drugs on credit, or fronting, without more" is not enough to justify a leader enhancement under § 3B1.1.  United States v. Sallis, 533 F.3d at 1223-24 (quoting United States v. Anderson, 189 F.3d at 1212)(citing United States v. Owens, 70 F.3d 1118, 1129 (10th Cir. 1995)).

"A two-level adjustment under § 3B1.1(c) applies whenever 'the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five participants and that is not otherwise extensive].'" United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009)(alterations in original)(quoting U.S.S.G. § 3B1.1(c)). See United States v. Tilga, 824 F. Supp. 2d 1295, 1319 n.12 (D.N.M. 2011)(Browning, J.)("Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons. The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization."). "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." U.S.S.G. § 3B1.1 Application Note 3. "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1, Background.

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct. "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction. To qualify as an organizer, however, no control is necessary." United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998); United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009)). The Tenth Circuit has recognized that, as a result of the Commission's inclusion of managers or supervisors along with organizers in § 3B1.1(c), "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United

States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997). Thus, "'[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.'" United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112 (1st Cir. 1995)).

## LAW REGARDING DOWNWARD DEPARTURES

The Guidelines "place essentially no limit on the number of potential factors that may warrant a departure." Koon v. United States, 518 U.S. 81, 106 (1996). See United States v. Coleman, 188 F.3d 354, 358 (6th Cir.1999)(en banc)(stating that there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. at 92. Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, No. CR 10-2563, 2012 WL 2574807 (D.N.M. June 22, 2012)(Browning, J.), the Court did not grant a defendant request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category over-represented the seriousness of his criminal history and the likelihood that he would commit other

crimes.  See 2012 WL 2574807, at *25.  The Court noted that Jim's criminal history included: (i) two DWI convictions; (ii) a conviction for Roadway Laned Traffic; and (iii) Abandonment or Abuse of a Child.  See 2012 WL 2574807, at *25.  The Court found that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time the assaulted the victim.  See 2012 WL 2574807, at **3, 25.  The Court noted that it "does not take much for a defendant to qualify for a criminal history category of II," and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3.2012 WL 2574807, at *25.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G. § 5H1.11, for a downward departure based upon the defendant's eleven years of military service.  See 2011 WL 831279, at *3.  Even though Jager had received exemplary reviews in his performance reports, earning either the highest or second highest ratings possible, during his military career, the Court found that his service was not present in an unusual degree or distinguishable from other cases covered by the Guidelines.  The Court noted that in many child pornography cases, such as Jager's, the defendant leads an exemplary and life publicly, while engaging in a secret life privately.  Jager's case was thus not distinguishable from other defendants sentenced under the Guidelines.  Additionally, because Jager was not in intense combat during his military career, most of his time was spent in the support role of a mechanic.

The Court found, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure. See 2011 WL 831279, at **10-11.

## ANALYSIS

Gonzales' objections to the PSR are sustained in part and overruled in part. The Court sustains Gonzales' objection to paragraph 71 of the Original PSR, which imposed a 2-level enhancement under U.S.S.G. § 2B1.1(b)(11)(C)(i). The Court also sustains in part Gonzales' eighth objection -- to paragraph 136 of the PSR -- in so far as it varies from the Guidelines. The Court overrules all other objections. The Court denies all requests for a downward departure.[9] The Court will vary, but not as much as Gonzales requested. Finally, the Court has made a diligent effort to avoid any procedural or substantive error.

## I.     THE COURT WILL APPLY A 16-LEVEL ENHANCEMENT PURSUANT TO § 2B1.1(b)(1), BECAUSE THE INTENDED LOSS EXCEEDS $1,000,000.00.

Gonzales challenges the use of the intended loss amount of $1,317,411.00, rather than the actual loss amount of $804,735.73, to increase his base level offense by 16 levels under § 2B1.1(b)(1). The USPO grouped Counts 1 through 5 under § 3D1.2(d), and there is no dispute

---

[9]In addition to his Gonzales' specific objections, he advances a high-level argument that the recommended guideline sentence, based on five specific offense characteristics, which were not alleged in the indictment or admitted by Gonzales, violates the Fifth and Sixth Amendments to the Constitution of the United States. See Sentencing Memorandum at 9-20. The Court recognizes that the Tenth Circuit has left "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount." United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). Here, however: (i) the Court does not think that the sentence has been increased by an "extraordinary or dramatic" amount; (ii) the Court mitigates any increase with a variance; and (iii) even if the Court were to use the higher standard of clear and convincing evidence, the Court does not think that the result would be any different -- all of the enhancements would still apply.

that the guideline for 18 U.S.C. § 1341 and 18 U.S.C. § 1349 is found in § 2B1.1 of the Guidelines. There is also no dispute that the base offense level is 7 under § 2B1.1 because "(A) the defendant was convicted of an offense referenced to this guideline." U.S.S.G. § 2B1.1(a)(1). The question is whether, under § 2B1.1(b)(1), the Court should impose a 14-level enhancement or a 16-level enhancement for the suffered loss in this case. Section 2B1.1(b)(1) sets forth the table establishing by how much a base offense level should be increased depending on the "loss." Gonzales contends that a 14-level enhancement should apply under the table in § 2B1.1(b)(1), because the "actual loss" was $804,735.73. The United States and the USPO, by contrast, assert that a 16-level enhancement applies under § 2B1.1(b)(1), because the "intended or potential loss" was $1,317,411.00. The question therefore turns on the meaning of the word "loss" in § 2B1.1(b)(1).

Section 2B1.1(b)(1) does not itself define "loss," but the commentary to the guideline provides guidance. See United States v. Snowden, 806 F.3d 1030, 1032 (10th Cir. 2015). Comment Note 3(A) states that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). See United States v. Snowden, 806 F.3d at 1032. Here, Gonzales does not dispute that the intended loss was $1,317,411.00. He instead argues that: (i) punishing him for an inchoate, unrealized loss is inconsistent with other, competing sections of the Guidelines; and (ii) actual loss "is the fairest, most direct measurement of the loss in this case." Sentencing Memorandum at 12-14. On the first point, Gonzales argues that "the Guidelines do not contain a workable, internally consistent definition of the term 'loss,' particularly when a court employs the intended loss as the measure of harm instead of the actual loss." Sentencing Memorandum at 13. Gonzales asserts that four other sections of the Guidelines, taken together, create conflicting and inconsistent standards for measuring loss:

First, Section 2X1.1(b)(1) and (b)(2) provide that the base offense level for a substantive offense must be reduced by three levels if the defendant was convicted of an attempt or a conspiracy "unless the defendant completed all of the acts the defendant believed necessary for successful completion of the substantive offense." Second, Application Note 3(E)(I) of section 2B1.1 provides that loss shall be reduced by the money returned. Third, Application Note 3(B) provides that the gain to the defendant may be an alternate measure of loss. Fourth, under Application Note 1, the only people who can qualify as "victim" under section 2B1.1 are people who sustained an actual loss.

Sentencing Memorandum at 13.

Regarding Commentary Note 3(E)(i) of § 2B1.1, which provides that loss shall be reduced by the money returned, Gonzales does not contend that he returned any money to his victims in this case. Further, Application Note 3(B) of § 2B1.1 provides that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 cmt. n. 3(B). Here, however, Gonzales does not assert that the loss cannot reasonably be determined. Moreover, the Court does not view these two guideline commentary notes as inconsistent or conflicting with § 2B1.1 Comment Note 3(A)'s general rule that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n. 3(A). Commentary Note 3(A) is the starting point in the calculation of loss -- whether actual or intended. Comment Note 3(B) is triggered only if loss cannot reasonably be determined under Commentary Note 3(A). If the loss can be calculated, however, Commentary Note 3(E)(I) provides for a reduction if the defendant returned any money. In sum, holistically considering the commentary notes to § 2B1.1, the Court concludes that Commentary Notes 3(E)(i) and 3(B) do not conflict with Commentary Note 3(A)'s definition of "loss" as "the greater of actual or intended loss." U.S.S.G. § 2B1.1 cmt. n. 3(A).

Gonzales also contends that, under Application Note 1 to § 3B1.1, only those who sustain an actual loss qualify as "victims." Gonzales is correct that Application Note 1 to § 2B1.1

defines "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. § 3B1.1 cmt. n. 1.  The commentary appears to have included this definition of "victim" because § 2B1.1(b)(2) contains an enhancement for offenses that involve multiple victims.  The Court has found no case or commentary explaining why § 2B1.1(b)(1) imposes an enhancement based on actual or intended loss, while § 2B1.1(b)(2) imposes an enhancement for multiple victims, but only where there is actual loss.  Perhaps it can be explained by the difficulty of identifying victims who have experienced intended loss compared to identifying aggregate potential losses.  In the end, the Sentencing Commission is not required to treat money and victims similarly.  The Court recognizes tension here, but it must apply the Guidelines as they are written.

Gonzales also argues that, under § 2X1.1(b)(1) and (b)(2), he is entitled to a 3-level reduction for an attempted theft under Count 1.  As the USPO notes in the Addendum, as § 2X1.1(b) sets out, pursuant to § 3D1.3(b), "in the case of counts grouped together under this section, when two counts involve offenses of the same general type to which different guidelines apply, apply the offense guideline that produces the highest offense level."  Addendum at 1.  The Court agrees with the USPO that, "[i]n the instant offense, only Count 1, is a Conspiracy, which would be covered under USSG §2X1.1 (Attempt, Solicitation, or Conspiracy Not Covered by a Specific Offense Guideline).  Counts 2 through 5 are specifically covered under USSG §2B1.1, which was used throughout the Presentence Report as the applicable guideline."  Addendum at 1-2.  In sum, the Court does not think the four other sections of the Guidelines that Gonzales identifies, taken together, create conflicting and inconsistent standards for measuring loss.

Gonzales' second point is that actual loss "is the fairest, most direct measurement of the loss in this case."  Memorandum at 12-14.  That conclusion may be the true, but the plain

language of the sentencing guidelines and of Commentary Note 3(A) defines "loss" as "the greater of actual or intended loss," and that language binds the Court. U.S.S.G. § 2B1.1 cmt. n. 3(A). The Court is not free to substitute its policy choice or the Defendant's policy choice for that the Commission and Congress has made. At the sentencing hearing, Gonzales seemed to agree that there is no relief within the Guidelines on this objection and that the proper avenue to pursue this argument is through a variance. See Tr. at 6:8-12 (Court, Pori). The United States likewise insisted that, if Gonzales has an argument in his first objection, it must be pursued through the § 3553(a) factors. See Tr. at 6:16-7:8 (Court, Neda). Accordingly, the Court will overrule Gonzales' objection to paragraph 68 and apply a 16-level enhancement under § 2B1.1(b)(1). See United States v. Morris, 573 F. App'x 712, 726 (10th Cir. 2014)(rejecting the defendant's argument that the district court should have calculated his sentence based on actual loss rather than intended loss). The Court will nonetheless treat Gonzales' first objection as "a request for a variance after we calculate the guidelines correctly." Tr. at 8:3-14 (Court).

## II.    THE COURT WILL APPLY A 4-LEVEL ENHANCEMENT UNDER § 2B1.1(b)(2)(B), BECAUSE THE OFFENSE INVOLVED FIFTY OR MORE VICTIMS.

Gonzales challenges the imposition of a 4-level enhancement under § 2B1.1(b)(2)(B) for the number of victims. Under the sentencing guidelines, if an offense involved fifty or more victims, the offense level is increased by 4 levels. See U.S.S.G. § 2B1.1(b)(2)(B). Application Note 1 to § 2B1.1 defines a "victim" in part as "any person who sustained any part of the actual loss determined under section (b)(1)." U.S.S.G. § 2B1.1 cmt. n.1. Application Note 4(E) further defines a "victim" in a case involving "means of identification" as "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n. 4(E).

In the PSR, the USPO recommended a 4-level enhancement based on the number of victims involved in Gonzales' offense. The PSR states: "As noted in the Offender Conduct, 107 victims have been identified in this case." PSR ¶ 69, at 21. The "Offender Conduct" section of the PSR in turn states:

> The investigation has revealed that 61 P.O. Boxes were opened throughout Texas, Colorado, and New Mexico, with approximately 107 victim identities that were fraudulently utilized and connected to 20 fictitious companies (11 in New Mexico, 7 in Colorado, and 2 in Texas). The scheme resulted in the total loss of $804,735.73.

PSR ¶ 7, at 5. The PSR then details how each victim's identity was fraudulently used as part of Gonzales' scheme. See PSR ¶¶ 11-59, at 6-19. Gonzales objected in writing and at the sentencing hearing to the 4-level victim enhancement. He argued that the only victims were those who suffered actual losses: (i) the Texas Workforce Commission; (2) the Colorado Department of Labor; and (iii) the New Mexico Workforce Solutions. See Sentencing Memorandum at 3. The Court agrees, however, with the USPO and the United States that this federal offense involves at least 107 victims, "whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n. 4(E). Gonzales and his co-Defendants filed fictitious unemployment insurance claims, and received benefits on behalf of the approximately 107 identified employees using their social security number and personal identification number. The Court therefore overrules Gonzales' objection to paragraph 69, and will apply a 4-level enhancement under § 2B1.1(b)(2)(B) for the number of victims.

## III.    THE COURT WILL IMPOSE A 2-LEVEL ENHANCEMENT FOR USE OF SOPHISTICATED MEANS UNDER § 2B1.1(b)(10)(C).

Gonzales "objects generally to an enhancement of his sentence for the use of sophisticated means under 2B1.1[b][10][C] because that fact substantially overlaps with, and is adequately taken into account by, the loss amount in section 2B1.1[b][1][H]." Sentencing

Memorandum at 3. Section 2B1.1(b)(10)(C) states: "if the offense otherwise involved sophisticated means, increase by 2 levels." U.S.S.G. § 2B1.1(b)(10)(C). Application Note 9(B) defines "sophisticated means" for purposes of the sophisticated means enhancement under § 2B1.1(b)(10)(C):

> For purposes of the subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1 cmt. n. 9(B). As the USPO correctly points out, under the sophisticated means enhancement, "[n]o consideration is made for the amount of loss, nor does the plain language of the guidelines suggest that a large amount of loss equates to sophisticated means." Addendum at 2. At the hearing, Gonzales conceded that he did not think that anyone could argue that this offense did not involve sophisticated means, see Tr. at 19:19-23 (Pori), admitting "I think enhancements under the facts do apply," see Tr. at 19:17-23 (Pori). Gonzales asserted, however, that he thinks that he has "a very good argument when it comes to considering this kind of variance based on substantially overlapping specific offense characteristics." See Tr. at 21:17-20 (Pori).

The Court agrees with the United States that the PSR sets forth sufficient facts for the Court to find that this scheme was a sophisticated one involving significant planning, and the creation of companies and 107 fake identification cards. See Tr. at 21:22-25:2 (Neda). The Court recognizes Gonzales' concerns about how few defendants under similar facts receive more than one enhancement, but as stated at the hearing, that goes more to a Kimbrough or variance argument. See Tr. at 26:3-16 (Neda). The Court therefore overrules Gonzales' objection to

paragraph 70 of the PSR and imposes a 2-level enhancement under § 2B1.1(b)(10)(C) because the offense involved sophisticated means.

## IV. THE COURT WILL IMPOSE A 4-LEVEL ENHANCEMENT PURSUANT TO § 3B1.1(a), BECAUSE GONZALES WAS THE ORGANIZER OR LEADER OF CRIMNIAL ACTIVITY WHICH INVOLVED FIVE OR MORE PARTICIPANTS.

Gonzales challenges the imposition of an aggravating role enhancement under § 3B1.1(a). The PSR imposes a 4-level enhancement under § 3B1.1(a) because Gonzales was an organizer or leader of criminal activity which involved five or more participants. Section 3B1.1(a) states: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels." U.S.S.G. § 3B1.1(a) (bold in original). Gonzales maintains that this enhancement "substantially overlaps with, and is adequately taken into account by, the loss amount in section 2B1.1[b][1][H]." Sentencing Memorandum at 4. The Court has reviewed the Application Notes for § 3B1.1 and agrees with the USPO that they do "not reflect that the amount of loss has any bearing on the defendant's role under this section." Addendum at 3. Moreover, as with the sophisticated means enhancement, Gonzales conceded at his sentencing hearing that he did not think that anyone could argue that this offense did not involve leading or managing more than five people. See Tr. at 19:19-23 (Pori). As stated above, Gonzales admitted that "enhancements under the facts do apply," see Tr. at 19:17-23 (Pori), but asserted that he thinks that he has "a very good argument when it comes to considering this kind of variance based on substantially overlapping specific offense characteristics," see Tr. at 21:17-20 (Pori). Based on the facts set forth in the PSR, the Court finds by a preponderance of the evidence that Gonzales managed or organized criminal activity that involved five or six people: Archuleta and unindicted individuals, identified as Christina Cardenas, Christine Ortega, Michelle Espinoza, Jacob Roybal, Christina Gonzales, and

Charles Diaz.  See PSR ¶ 5, at 4.  Group crimes are punished more severely, because they create more danger and crimes.  The Court will construe Gonzales' argument on this point as a request for a variance, but concludes that the enhancement is warranted under the Guidelines' plain language.  The Court therefore overrules Gonzales' objection to paragraph 73 of the PSR and imposes a 4-level enhancement pursuant to § 3B1.1(a), because Gonzales was the organizer or leader of criminal activity which involved five or more participants.

## V.     THE COURT WILL NOT DEPART BASED ON GONZALES' MENTAL AND EMOTIONAL CONDITIONS.

Gonzales asks that the Court depart based on U.S.S.G. § 5H1.3, because, he asserts, he is a survivor of childhood trauma and abuse, and because he has struggled with depression and anxiety since he was young, and has repeatedly sought treatment for his mental health disease.  See Sentencing Memorandum at 22.  U.S.S.G. § 5H1.3 provides that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  U.S.S.G. § 5H1.3.  Regarding Gonzales' mental and emotional conditions, the PSR explains:

> As noted above, the defendant reported he suffered from psychological and emotional abuse from his father during his formative years.  As a result, he experienced mental health issues as a teenager, which was later diagnosed as Dysthymic Disorder, Intermittent Explosive Disorder, and generalized anxiety disorder.  He received treatment at an unknown inpatient mental health facility in Calabasas, California, where he remained for 6 to 8 months.  He was then released to Provo Canyon High School, a boarding school, which provided mental health treatment in addition to an academic curriculum.  Upon completion, the defendant attended outpatient counseling with an unknown provider until his arrest in March 1991.  He reported he has not experienced any issues since he completed treatment at Provo Canyon.  The defendant's mother and wife reported the defendant was sexually abused by a babysitter when he was approximately five years old, which may have contributed to his mental health issues as a teenager.  The defendant did not disclose this abuse during the presentence

interview. The defendant appears to have addressed his mental and emotional needs adequately, and reported no reoccurrence of mental health issues.

PSR ¶ 133, at 34. The Court agrees with the USPO that, based on this factual evaluation of his mental condition, a downward departure based on Gonzales' mental and emotional conditions is unwarranted. See PSR ¶ 133, at 34; Addendum at 3. The Court will deny Gonzales' request for a departure. The Court is having trouble squaring his mental and emotional problems with the sophisticated criminal enterprise in this case and a considerable criminal record. The Court acknowledges that the Guidelines authorize a departure on these grounds, but does not believe that Gonzales' circumstances are so extraordinary or sufficiently unique to warrant a downward departure. The Court chooses not to depart, because it does not believe a departure is warranted under the facts and circumstances here. Unfortunately, the nation's prisons and the criminal justice system contain many who have mental and emotional problems. The Court is having trouble distinguishing Gonzales' case from the many others who appear before the Court, this District, and the federal courts throughout the country. This case falls into the heartland of cases the Court and other federal courts see. The Court is unable to distinguish the circumstances of this case from the heartland of cases and will therefore exercise its discretion to decline to depart downward based on Gonzales' mental and emotional conditions. While a departure is authorized for these conditions in the right circumstances, even if a departure were warranted under the facts of this case -- which it is not -- the Court would still exercise its discretion not to depart, because of its conviction that this case remains in the heartland of federal cases and because of the sophisticated nature of the crime.

## VI. THE COURT WILL NOT DEPART BASED ON GONZALES' PHYSICAL CONDITIONS, INCLUDING DRUG OR ALCOHOL DEPENDENCE OR ABUSE, AND GAMBLING ADDICTION.

Gonzales asks that the Court depart based on U.S.S.G. § 5H1.4, because, he asserts, he

has a serious addiction to prescription pain medication and has a persistent, untreated gambling

addiction.  See Sentencing Memorandum at 4.  U.S.S.G. § 5H1.4 provides in full:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.  An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

> **Drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure.  Substance abuse is highly correlated to an increased propensity to commit crime.**  Due to this increased risk, it is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program (see § 5D1.3(d)(4)).  If defendant participation in a substance abuse program is required, the length of supervised release should take into account the length of time necessary for the probation office to judge the success of the program.

> In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose.  See § 5C1.1, Application Note 6.

> In a case in which a defendant who is a substance abuser is sentenced to probation, it is strongly recommended that the conditions of probation contain a requirement that the defendant participate in an appropriate substance abuse program.  (see § 5B1.3(d)(4)).

> **Addiction to gambling is not a reason for a downward departure.**

U.S.S.G. § 5H1.4 (emphasis added).  Regarding Gonzales' physical condition, including drug or

alcohol dependence or abuse, and gambling addiction, the PSR explains:

> As noted above, the defendant has history [sic] of addiction to opiate pain medication as well as gambling, both of which may have contributed to his commission of the instant offense.  As noted in USSG § 5H1.4, drug abuse is not ordinarily a reason for a downward departure as it is highly correlated to an

increased propensity to commit crime. It should be noted, the defendant has proactively sought treatment for his opiate addiction and is currently prescribed a transdermal patch to reduce his dependence on opiate pain medication. In addition, gambling addiction is not a reason for a downward departure. Based on this, a downward departure under Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction is not warranted under the guidelines, but may be considered as factors under 18 U.S.C. § 3553(a).

PSR ¶ 134, at 34. The Court will deny Gonzales' request for a departure. The Court does not

believe that a departure for addiction to gambling -- at least alone -- is warranted in this case.

The Court is having trouble squaring his addictions -- be they to substances or gambling -- with

the sophistication of his criminal activity. In any case, the Court chooses not to depart, because

it does not believe a departure for substance abuse or for gambling addiction is warranted with

the case's facts and circumstances of the. The Court acknowledges that the Guidelines authorize

a departure on at least some of these grounds, but does not believe that Gonzales' circumstances

are extraordinary or sufficiently unique to warrant a downward departure.

First, the Guidelines by their own terms state that "[a]ddiction to gambling is not a reason

for a downward departure." U.S.S.G. § 5H1.4. Further, § 5K2.0(d) adds: "Prohibited

Departures. -- Notwithstanding . . . any other provision in the guidelines, the court may not

depart from the applicable guideline range based on . . . the last sentence of 5H1.4." United

States v. Quinn, 566 F. App'x 659, 670 (10th Cir. 2014)(unpublished). The Court has not found

a case directly addressing whether a district court has the authority to depart based on a

defendant's gambling addiction -- despite the express language of § 5H1.4 and § 5K2.0(d) --

pursuant to Koon v. United States, 518 U.S. at 81, where the Supreme Court held the Guidelines

"place essentially no limit on the number of potential factors that may warrant a departure," 518

U.S. at 106, and that a departure is warranted if the case is "unusual enough for it to fall outside

the heartland of cases in the Guideline," 518 U.S. at 92. In one sense, it is odd that the

Guidelines explicitly forbid a departure for certain factors yet <u>Koon v. United States</u> opens the door to departing for these same forbidden factors. There are at least a couple of ways to reconcile this tension. One would be to say that <u>Koon v. United States</u> and the Guidelines require an extraordinary forbidden factor plus something else. <u>See</u> <u>United States v. Quinn</u>, 566 F. App'x at 572 (holding that a district court can depart downward based on a gambling addiction under a diminished capacity departure pursuant to § 5K2.13). In analyzing whether a district court can depart based on a defendant's lack of guidance as a youth under § 5H1.12 -- another "forbidden" factor under the Guidelines, <u>see</u> U.S.S.G. § 5H1.12 ("Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted.") -- the Tenth Circuit has indicated that a district court could potentially grant a downward departure "to a defendant who had suffered extreme psychological and physical abuse as a child." <u>United States v. Browning</u>, 252 F.3d 1153, 1160 (10th Cir. 2001)(citing <u>United States v. Ayers</u>, 971 F. Supp. 1197 (N.D. Ill. 1997)). In <u>United States v. Browning</u>, the Tenth Circuit stated: "*Ayers* persuasively distinguishes 'exceptionally cruel . . . psychological and emotional abuse' constituting 'a form of sadistic torture' from the generalized lack of guidance or neglect that § 5H1.12 prohibits as a basis for departure." 252 F.3d at 1160 (quoting <u>United States v. Ayers</u>, 971 F. Supp. at 1200-01). A second solution would be to require a super-extraordinary presence of a forbidden factor. In any case, the Court concludes that the Court could depart under <u>Koon v. United States</u> based on Gonzales' gambling addiction, if it is present with other factors or it is present in a super-extraordinary way. The Court has a hard time imagining a situation when it would find that a gambling addiction warrants a departure, but the possibility under <u>Koon v. United States</u> is there. In this case, gambling addiction is mentioned, but not discussed greatly, so the Court cannot on

the record find it is present to an extraordinary degree, much less using some higher standard. Even if combined with the substance addiction and other factors, the Court remains confident that this is a heartland case. In any case, the Court would exercise its discretion and decline to depart under the circumstances of this case.

Second, as the USPO notes, drug dependence is not ordinarily a reason for a downward departure. See PSR ¶ 134, at 34. Gonzales has sought treatment for his opiate addiction, and the Court is unable to distinguish the circumstances of this case from the heartland of cases, and will therefore exercise its discretion to decline to depart downward based on Gonzales' addiction to prescription pain medication or his gambling addiction. After recognizing a departure is authorized for gambling addiction, the Court would nonetheless exercise its discretion not to depart for gambling addiction in this case, either for that addiction or in combination with those addictions. Unfortunately, the nation's prisons and criminal justice system contain many who have some addiction, mostly drugs and alcohol. Even gambling addiction is just a reason for a need for money, and almost everyone in the criminal justice system needs money. This case falls into the heartland of cases that the Court sees, the District sees, and the federal courts everywhere in the country see. Thus, while a departure is authorized for substance abuse addiction and gambling, under the facts of this case, the Court would exercise its discretion not to depart, because this case remains a heartland case. The Court agrees with the USPO that a downward departure is not warranted in this case.

**VII.  THE COURT WILL NOT DEPART BASED ON GONZALES' COOPERATION WITH LAW ENFORCEMENT, HIS POST-OFFENSE REHABALITATION EFFORTS, HIS "EXTRAORDINARY" ACCEPTANCE OF RESPONSIBILITY, HIS EDUCATIONAL AND VOCATIONAL SKILLS, HIS LONG AND STEADY EMPLOYMENT HISTORY, HIS LACK OF GUIDANCE AS A YOUTH, OR BASED ON THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES.**

In the section of Gonzales' Sentencing Memorandum titled "Objections to the Pre-Sentence Investigation Report," Gonzales makes eight specific objections to the PSR. Sentencing Memorandum at 2.  For Gonzales' eighth specific objection, he states:

> Paragraph 136 – Mr. Gonzales contends that, in addition to the factors identified in the Pre-Sentence Investigation Report which could support a departure or variance, this Honorable Court can depart or vary from the sentence recommended by the United States Sentencing Guidelines in an effort to avoid unwarranted sentencing disparities caused by substantially overlapping specific offense characteristics which unreasonably aggregate Mr. Gonzales' sentence. Cf. *United States v. Lauersen*, 348 F.3d 329 (2nd Cir. 20[03]).  [sic] In addition, Mr. Gonzales contends that this Honorable Court could depart or vary based on his cooperation with law enforcement officers following the detection of his criminal offense and his post-offense efforts at rehabilitation.

Sentencing Memorandum at 4.  Gonzales later identifies additional factors that he contends could support a downward departure, including: (i) his educational and vocational skills under U.S.S.G. § 5H1.2; (ii) his long and steady employment history under U.S.S.G. § 5H1.5; (iii) his extraordinary acceptance of responsibility; and (iv) his lack of guidance as a youth[10] under U.S.S.G. § 5H1.12.  See Sentencing Memorandum at 20-22.

---

[10]Gonzales states that, "although a defendant's lack of guidance as a youth is ordinarily not relevant in determining whether a departure is warranted (USSG § 5H1.2), a Court may consider this factor in combination with other aspects of the defendant's background in assessing 'the history and characteristics of the defendant.'"  Sentencing Memorandum at 21 (quoting 18 U.S.C. § 3553(a)(1)).  Gonzales appears to argue that lack of guidance as a youth can justify only a variance and not a departure.  As the Court will explain, even if lack of guidance as a youth could justify a downward departure, the Court would exercise its discretion and decline to depart under the circumstances of this case.

First, the Court declines to depart based on Gonzales' extraordinary acceptance of responsibility or his cooperation with law enforcement following the detection of his criminal offense. Gonzales notes that "[c]ourts may grant additional consideration to defendants who demonstrate acceptance beyond that necessary to obtain a two or three level reduction under § 3E1.1 because such conduct bears directly on their character and on how severe a sentence is necessary to provide deterrence and punishment." Sentencing Memorandum at 21 (quoting United States v. Severino, 454 F.3d 206, 211 (3d Cir. 2006)). The Court agrees with Gonzales that extraordinary acceptance of responsibility and cooperation with law enforcement can support a downward departure under the appropriate facts and circumstances. The Tenth Circuit in United States v. Jones, 158 F.3d 492, 502 (10th Cir. 1998), explained:

> In discussing grounds for departure, the Sentencing Guidelines state that "[i]f the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a departure below the applicable guideline range for that offense may be warranted." U.S.S.G. § 5K2.16, p.s. However, disclosures motivated by "the defendant's knowledge that discovery of the offense is likely or imminent, or where the defendant's disclosure occurs in connection with the investigation or prosecution of the defendant for related conduct" are excluded. *Id.*

158 F.3d at 502. Here, however, Gonzales did not voluntarily disclose the offense before his arrest and the discovery of his criminal offense. It appears that, because Gonzales' "disclosure occur[ed] in connection with the investigation or prosecution of the defendant for related conduct," a departure under U.S.S.G. § 5K2.16 is not expressly authorized. United States v. Jones, 158 F.3d at 502. Even if the Court could depart under § 5K2.16 or under Koon v. United States, however, it would exercise its discretion and decline to do so, because the Court agrees with the USPO that Gonzales' cooperation did not have any element of extraordinary compliance and that it "was cooperative to what appears to be a normal degree since he became aware that

the offense had been discovered." Addendum at 3. Most defendants behave before sentencing, and Gonzales' behavior was not much different -- and certainly not significantly so -- while awaiting sentencing. The Court has a difficult time distinguishing him from many other defendants it sees and concludes that he remains comfortably within the heartland of federal cases.

The Court also declines to depart downward based on Gonzales' post-arrest efforts at rehabilitation. The Court agrees with Gonzales that "a court may consider 'post offense rehabilitative efforts' in deciding whether to grant a reduction of a criminal offense." Sentencing Memorandum at 22 (quoting United States v. Rutherford, 323 F. Supp. 2d 911, 914 (E.D. Wis. 2004)). Here, Gonzales has received a 3-level reduction under § 3E1.1(a) and (b) and, as explained below, the Court considers Gonzales' post-arrest efforts at rehabilitation in its analysis whether a variance is warranted. The Court does not view § 3E1.1(a) and (b) as grounds for departure, but rather, as grounds for reduction or a decrease. All of the departures are in Chapter 5 of the Guidelines, not Chapter 2. In any event, the Court does not believe that Gonzales' circumstances are extraordinary or sufficiently unique to warrant a downward departure based on his post-arrest efforts at rehabilitation. Regarding Gonzales' post-arrest rehabilitation efforts, the Addendum states:

> [S]ince his release on Pretrial Supervision, with the permission of his supervising officer, the defendant self-referred himself to Presbyterian Medical Services Santa Fe Community Guidance Center and was prescribed Suboxone via transdermal patch, to address his opiate addiction. No counseling was recommended by the prescribing physician and he was not referred to counseling by the United States Probation Office. Although the defendant has refrained from the use of prescription drugs and remained compliant with his conditions of release, this does not support his compliance had any element of extraordinary rehabilitative efforts.

Addendum at 3. The Court agrees with the USPO that a downward departure is not warranted in this case. The Court does not believe that Gonzales' circumstances are extraordinary or sufficiently unique to warrant a downward departure. The Court is unable to distinguish the circumstances of this case from the heartland of cases and will therefore exercise its discretion and not depart downward based on Gonzales' cooperation with law enforcement officers following the detection of his criminal offense and his post-offense efforts at rehabilitation.

Gonzales also cites to his long and steady employment history under § 5H1.5 as a possible grounds for departure. "Employment history ordinarily is a discouraged basis for departure." United States v. Jones, 158 F.3d at 498 (citing U.S.S.G. 5H1.5).

> However, neither the Sentencing Guidelines nor Tenth Circuit precedent categorically precludes the district court's consideration of employment history in making its departure decision. As the Supreme Court has made clear, the Sentencing Commission "chose to prohibit consideration of only a few factors, and not otherwise limit, as a categorical matter, the considerations which might bear upon the decision to depart." *See Koon*, 598 U.S. at 94; *see also* U.S.S.G. Ch. 1, Pt. A, intro comment. 4(b) (indicating Commission "does not intend to limit the kinds of factors, whether or not mentioned elsewhere in the guidelines, that could constitute grounds for departure in an unusual case"). While the court rejected reliance on employment history, along with five other considerations, as evidence of an "extraordinary acceptance of responsibility" in *Ziegler*, 39 F.3d at 1062, elsewhere we have affirmed downward departures in part on this factor. *See United States v. Tsosie*, 14 F.3d 1438, 1441-42 (10th Cir. 1994)(using defendant's long-term employment as one factor demonstrating offense conduct was aberrational).

158 F.3d at 498.

The Court therefore acknowledges that the Guidelines authorize a departure based on Gonzales' long and steady employment history, but does not believe that Gonzales' circumstances are extraordinary or sufficiently unique to warrant a downward departure. The Court is unable to distinguish the circumstances of this case from the heartland of cases and will

therefore exercise its discretion to decline to depart downward based on Gonzales' long and steady employment history.

For similar reasons, the Court declines to depart based on Gonzales' educational and vocational skills pursuant to U.S.S.G. § 5H1.2.  Section 5H1.2 states:

> **Education and vocational skills are not ordinarily relevant in determining whether a departure is warranted**, but the extent to which a defendant may have misused special training or education to facilitate criminal activity is an express guideline factor.  <u>See</u> § 3B1.3 (Abuse of Position of Trust or Use of Special Skill).
>
> Education and vocational skills may be relevant in determining the conditions of probation or supervised release for rehabilitative purposes, for public protection by restricting activities that allow for the utilization of a certain skill, or in determining the appropriate type of community service.

U.S.S.G. § 5H1.2 (emphasis added).  The Tenth Circuit has articulated that education and vocational skills are "discouraged factors."  <u>United States v. Alvarez-Pineda</u>, 258 F.3d 1230, 1239-40 (10th Cir. 2001).  According to the Tenth Circuit, "they are permissible departure factors only in 'extraordinary cases,' *i.e.*, when the court finds they are present 'in some unusual or exceptional way.'"  <u>United States v. Alvarez-Pineda</u>, 258 F.3d at 1240 (quoting U.S.S.G. § 5K2.0, cmt.).  In any other case, the Court might find that there is something unusual or exceptional about Gonzales having received a bachelor's degree in Accounting from Utah State University while he was incarcerated, and having had stable employment in New Mexico.  <u>See</u> PSR ¶¶ 101-108, at 28-29.  Here, however, Gonzales turned around and used his new found skills to commit a larger economic crime.  The Court therefore concludes that a departure based on Gonzales' educational and vocational skills is unwarranted.

Gonzales also cites his lack of guidance as a youth as a possible ground for a variance or departure.  <u>See</u> Sentencing Memorandum at 21.  Gonzales appears to discuss this factor primarily as a basis for a variance, but the Court will nonetheless address whether it can or should rely on

Gonzales' lack of guidance as a youth as a basis to depart from the Guidelines. The Tenth Circuit has stated that lack of guidance as a youth under § 5H1.12 is a "forbidden" factor that can never be a basis for departure. See United States v. Caldwell, 219 F.3d 1186, 1191 n.5 (10th Cir. 2000). "As a general matter, U.S.S.G. § 5H1.12 prohibits downward departures for '[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing.'" United States v. Browning, 252 F.3d at 1160. The Tenth Circuit has indicated that a district court could potentially grant a downward departure "to a defendant who had suffered extreme psychological and physical abuse as a child." United States v. Browning, 252 F.3d at 1160 (citing United States v. Ayers, 971 F. Supp. at 1197. In United States v. Browning, the Tenth Circuit stated: "Ayers persuasively distinguishes 'exceptionally cruel . . . psychological and emotional abuse' constituting 'a form of sadistic torture' from the generalized lack of guidance or neglect that § 5H1.12 prohibits as a basis for departure." 252 F.3d at 1160 (quoting United States v. Ayers, 971 F. Supp. at 1200-01). See United States v. Rivera, 192 F.3d 81, 84-85 (2d Cir. 1999)(noting that several Courts of Appeals have "held that a downward departure may be appropriate in cases of extreme childhood abuse" and citing cases). Even if the Court could depart under Koon v. United States based on Gonzales' lack of guidance as a youth or his upbringing, it would exercise its discretion and decline to do so under the circumstances of this case. Regarding Gonzales' mental and emotional conditions resulting from his difficult childhood, the PSR states:

> As noted above, the defendant reported he suffered from psychological and emotional abuse from his father during his formative years. As a result, he experienced mental health issues as a teenager, which was later diagnosed as Dysthymic Disorder, Intermittent Explosive Disorder, and generalized anxiety disorder. He received treatment at an unknown inpatient mental health facility in Calabasas, California, where he remained for 6 to 8 months. He was then released to Provo Canyon High School, a boarding school, which provided mental health treatment in addition to an academic curriculum. Upon completion, the defendant attended outpatient counseling with an unknown provider until his arrest in March 1991. He reported he has not experienced any issues since he

> completed treatment at Provo Canyon. The defendant's mother and wife reported the defendant was sexually abused by a babysitter when he was approximately five years old, which may have contributed to his mental health issues as a teenager. The defendant did not disclose this abuse during the presentence interview. The defendant appears to have addressed his mental and emotional needs adequately, and reported no reoccurrence of mental health issues.

PSR ¶ 133, at 34. Gonzales did not disclose the alleged sexual abuse, and he otherwise appears to have addressed his mental and emotional problems. Based on the evidence set forth in the PSR and under the circumstances of this case, the Court does not think that there is sufficient evidence of "'exceptionally cruel . . . psychological and emotional abuse' constituting 'a form of sadistic torture.'" 252 F.3d at 1160 (quoting United States v. Ayers, 971 F. Supp. at 1200-01). The Court therefore declines to depart downward based on Gonzales lack of guidance as a youth.

Finally, Gonzales states that the Court can "depart or vary from the sentence recommended by the United States Sentencing Guidelines in an effort to avoid unwarranted sentencing disparities caused by substantially overlapping specific offense characteristics which unreasonably aggregate Mr. Gonzales' sentence." Sentencing Memorandum at 4. It seems odd for the Court to carefully and meticulously calculate the Guidelines, and then depart because it did that task correctly. Even if the Court can depart based on the need to avoid unwarranted sentencing disparities caused by substantially overlapping specific offense characteristics, it would exercise its discretion and decline to do so. The Guidelines are what they are, and there is no sound reason here to depart because they are correctly applied; if anything, a strict calculation of the Guidelines eliminates disparities among similarly situated individuals with similar criminal histories. The Court will instead consider this factor in its analysis whether a variance is warranted in this case.

## VIII.   THE COURT HAS BEEN CAREFUL TO AVOID PROCEDURAL ERROR.

The Court recognizes that after United States v. Booker, 543 U.S. at 220, the Guidelines

sentencing ranges are effectively advisory and not binding. The Court has conducted a proper guidelines analysis, starting with Gonzales base offense level, and then applying the applicable enhancements and departures that the Guidelines set forth. The Court has strived to distinguish where it is and is not authorized to impose a departure. Where the Court has found that it is not authorized to depart, the Court has explained, that even if it could depart, it would exercise its discretion and decline to do so under the circumstances of this case. After conducting this analysis, the Court will next determine whether it will grant Gonzales' request for a variance.

## IX. <u>THE COURT WILL VARY FROM THE GUIDELINES RANGE.</u>

Gonzales' total offense level under the Guidelines is 30, his criminal history category is II, and his sentencing range, therefore, is 108 to 135 on counts one through five. As to Count 6, the guideline sentence is the statutorily required sentence of 24 months, which will run consecutively to any sentence imposed. The Court will vary downward from the Guidelines range to fashion a sentence that is sufficient, but not greater than necessary, to comply the following purposes:

> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)** to afford adequate deterrence to criminal conduct;
>
> **(C)** to protect the public from further crimes of the defendant; and
>
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

18 U.S.C. § 3553(a)(2). In tailoring a sentence to meet these ends, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

The Court has identified roughly eleven factors that put downward pressure on Gonzales'
sentence.    First,  although  the  Court  has  no  <u>Kimbrough</u>  disagreement  with  the  Guidelines
advisory range, it does think that the following three sub-factors put downward pressure on the
sentence: (i) the actual loss here is considerably below the intended loss; (ii) although there are
more than fifty victims by operation of the Guidelines, only three governmental agencies are
sustaining  actual  losses  in  this  case;  and  (iii)  although  this  criminal  enterprise  qualifies  as
sophisticated under the Guidelines, in reality, it was probably going to be discovered.   Second,
Gonzales' history and characteristics put downward pressure on the sentence -- he seems to be a
good father and that he has a seven-year-old daughter puts downward pressure on the sentence.
The Court should strive to not lock him up more than necessary because his daughter needs him,
and studies within the state prison system in the southern part of the state show that fathers who
stay in contact with their children while they are in custody have a lower recidivism rate.   <u>See</u> R.
Romo, "Prison Program Will Expand, Father Helped in Southern Facility," <u>Albuquerque Journal</u>,
at B3 (July 7, 2004)("When fathers who are incarcerated are connected to their children and their
families, the inmates' chances of coming back [to prison] decrease.").   Third, Gonzales was able
to use rehabilitation in the past to gain skills, including a college education, and benefit from it.
Fourth, that the recommended Guidelines range in this case is higher than other people who have
maybe done more harm in fraud or embezzlement cases and the need to promote respect for the
law, put downward pressure on the sentence.   Fifth, the need for the sentence to be not greater
than necessary always puts downward pressure on the sentence.   Sixth, Gonzales' mental and
emotional  health  put  downward  pressure  on  the  sentence;  the  Court  can  use  conditions  of
supervised release -- rather than incarceration -- to address these problems.   Seventh, his physical
conditions, including alcohol and drug abuse put downward pressure on the sentence; again, the

Court can use conditions of supervised release -- rather than incarceration -- to address these problems. Eighth, that Gonzales cooperated with law enforcement following his arrest, that he offered to debrief, and that he pled guilty before Archuleta -- which may have contributed to Archuleta pleading guilty -- puts downward pressure on the sentence. Ninth, Gonzales' post-arrest rehabilitative efforts put downward pressure on the sentence. Tenth, that there is a sentencing disparity with other defendants who have similar records puts downward pressure on the sentence.[11] Eleventh, supervised release can go a long way in serving as an alternative to

---

[11]The evidence set forth on Gonzales' Sentencing Memorandum suggests that the defendants with loss levels similar to Gonzales are not receiving as high of sentences. See Sentencing Memorandum 19-20. At the hearing, Gonzales also asked the Court to consider the sentence that Manny Aragon received -- a sentence of 67 months. See Tr. at 28:17-30:3 (Court, Pori). In 2009, Aragon, a former president pro tem of the New Mexico Senate, received a sentence of 67-months imprisonment pursuant to a rule 11(c)(1)(c) plea agreement; he faced charges regarding a fraud conspiracy that related to overbilling the State of New Mexico for expenditures in which Aragon was to receive over $600,000.00. See United States v. Aragon, No. 07-0615, Plea Agreement ¶¶ 3, 7-8, at 2, 4-7, filed October 15, 2008 (D.N.M.)(Doc. 611)("Aragon Plea"); United States v. Aragon, No. 07–0615, Judgment in a Criminal Case at 2, filed April 29, 2009 (D.N.M.)(Doc. 824). Another co-defendant in that case, Raul Parra, admitted to taking "approximately $3.3 million in proceeds from . . . fraudulent overbillings," most of which Parra gave to his codefendants. United States v. Parra, No. 07–0615, Plea Agreement ¶ 7, at 4-6, filed October 14, 2008 (D.N.M.)(Doc. 610)("Parra Plea"). Parra agreed to a sentence that would not be greater than 71-months imprisonment and did not waive his appellate rights. See Parra Plea ¶¶ 8, 15, at 7, 12. He ultimately received a sentence of 46 months following a departure under U.S.S.G. § 5K1.1. See United States v. Parra, No. 07–0615, Clerk's Minutes at 2, filed March 17, 2009 (D.N.M.)(Doc. 782); United States v. Parra, No. 07–0615, Judgment in a Criminal Case at 2, filed April 30, 2009 (D.N.M.)(Doc. 825). Another co-defendant in that case, Toby Martinez -- a former administrator of the Bernalillo County Metropolitan Court -- stipulated to an amount of loss attributable to his conduct that was "more than $1,500,000.00 but not more than $2,500,000.00." United States v. Martinez, No. 07–0615, Plea Agreement ¶ 8, at 10, filed October 10, 2008 (D.N.M.)(Doc. 578). He ultimately received a sentence of 67 months. See No. 07–0615, Judgment in a Criminal Case at 2, filed May 5, 2009 (D.N.M.)(Doc. 827).

The Court also considers the sentence that the Court gave Robert Vigil in 2007 -- a sentence of 37-months imprisonment. See United States v. Vigil, No. 05–2051, Judgment in a Criminal Case at 2, filed February 22, 2007 (D.N.M.)(Doc. 456)(Browning, J.). The charges against Vigil related to abuse of his position as the head of the New Mexico State Treasurer's Office, including charges of extortion. See United States v. Vigil, 476 F. Supp. 2d 1231, 1242 (D.N.M. 2007)(Browning, K.). After the jury in the first trial hung, the jury in the retrial, one of

longer imprisonment; it may be that the Court can substitute supervised release for incarceration, and use supervised release to deal with Gonzales' drug and alcohol problems.

---

the most publicized trials in New Mexico history, acquitted Vigil on twenty-three counts and convicted him on one count. See United States v. Vigil, No. 05-2051, Verdict at 1-5, filed September 30, 2006 (D.N.M.)(Doc. 408)(Browning, J.). The jury convicted Vigil of attempt to extort property by wrongful use and threat of use of economic harm, and under color of official right, in violation of 18 U.S.C. § 1951(b)(2). See United States v. Vigil, 476 F. Supp. 2d at 1240. The Court calculated a guideline imprisonment range of "235 to 240 months." United States v. Vigil, 476 F. Supp. 2d at 1298. The relevant conduct under the guidelines included some of the conduct for which Vigil was acquitted, increasing dramatically his sentencing range. See United States v. Vigil, 476 F. Supp. 2d at 1290-97. While the jury did not find that some of the alleged criminal conduct occurred beyond a reasonable doubt, the Court found that some of the conduct occurred by a preponderance of the evidence. See United States v. Vigil, 476 F. Supp. 2d at 1290-97. See also United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)(recognizing "the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof" but concluding that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard"). The USPO recommended that the Court impose a downward variance for the following reasons, but did not specify a specific recommended sentence:

> In this case, when looking at the nature and circumstances of the offense and the history and characteristics of the defendant, the Court should consider several factors. Robert Vigil is currently 53 years old and this is his first contact with law enforcement or any Court. Additionally, the defendant has no history of violence. Mr. Vigil is a very educated person, and has maintained a stable employment history for his adult life.

United States v. Vigil, 476 F. Supp. 2d at 1244.

The Court ultimately sentenced Vigil to 37–months imprisonment. See United States v. Vigil, 476 F. Supp. 2d at 1324. In arriving at its sentence, the Court found it significant that: (i) the jury had acquitted Vigil on twenty-three counts; (ii) that Vigil had been acquitted of much of the relevant criminal conduct at issue; (iii) the length of a guideline sentence in light of his acquittal on twenty-three counts; (iv) the significant damage to Vigil's reputation and his high legal bills; (v) the relatively low need for specific deterrence to Vigil in light of his age; and (vi) the likelihood that his co-defendants would receive lighter sentences based on entering into plea agreements. United States v. Vigil, 476 F. Supp. 2d at 1306-24. Most importantly, however, the Court concluded that sentencing Vigil to 235 months, a sentencing length reflecting his relevant conduct under the guidelines, after he had been acquitted at trial on twenty-three counts would not promote respect for the law and would not result in a just sentence. See United States v. Vigil, 476 F. Supp. 2d at 1322 ("While the Court cannot say that this case falls outside the heartland of traditional extortion cases, the advisory guideline sentence in Vigil's case is too harsh and is greater than necessary to satisfy federal sentencing goals.").

There are, however, about nine factors that put upward pressure on the sentence and suggest that the Court should remain in the Guidelines range: (i) this federal offense is very serious and involved the theft of enormous amounts of public money; (ii) the sentence must reflect the actual loss here and the seriousness of the offense; (iii) the sentence must promote respect for the law; (iv) Gonzales has a criminal history which involves burglary and rape; (v) the sentence must afford adequate deterrence -- both at the specific and general level; (vi) there is a need to protect the public from Gonzales; (vii) Gonzales rehabilitated during his last incarceration, but used that rehabilitation to then commit this federal offense; (viii) there is a need to avoid unwarranted sentencing disparities created by varying or varying too much;[12] and (ix) the sentence must be sufficient to reflect the § 3553(a) factors.

On balance, the Court concludes that the factors that put downward pressure on the sentence slightly outweigh those that put upward pressure on the sentence to stay in the Guidelines range. In sum, the circumstances weigh in favor of varying below the Guidelines range by the equivalent of 2 levels, which produces a working Guidelines range of 87 to 108 months. The Court sentences Gonzales to a term of incarceration of 87-months imprisonment for Counts 1-5, and 24 months for Count 6, to run consecutively for a total term of imprisonment of 111 months. The Court also imposes a term of three years of supervised release on Counts one through five, and a concurrent one-year term of supervised release on Count 6, for a total term of three years.

---

[12]The need to avoid unwarranted sentencing disparities almost always puts upward pressure on the sentence to use a Guidelines range. If district courts were to strictly apply the Guidelines -- like they did when the Guidelines were mandatory -- and stay within the Guidelines range, sentences would always be uniform, which was thus in fact the purpose of the mandatory Guidelines.

The Court has, as the record and this opinion demonstrate, carefully considered the Guidelines, but in arriving at its sentence, the Court has taken into account other sentencing goals. Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant. After carefully considering the case's facts and circumstances, the Court concludes that the punishment set forth in the advisory Guidelines range is not appropriate for these offenses. The Court then carefully considered the kinds of sentences and the ranges that the Guidelines establish and concludes that a variance the equivalent of a couple of offense levels is appropriate. It thus sentences at the bottom of that working range -- 87 months. The Court carefully considered Gonzales' proposed sentence -- 81 months -- at which the Court's Guideline range is about six months above that, the Court did not think the facts and circumstances justify pushing it to that low of a level as Gonzales suggests. The Court concludes that a sentence of 87 months is sufficient -- but also necessary -- to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence (both at the general and specific level), protect the public, avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and, because the Court will place Gonzales on supervised release, effectively provide him with some needed education, training, and care to avoid these problems from reoccurring in the future. In sum, the Court concludes that the 87-month sentence fully and effectively reflects each of the factors embodied in 18 U.S.C. § 3553(a). While the Court's task, as a District Court and a sentencing court, is not to come up with a reasonable sentence, but to arrive at a sentence that accurately reflects the factors in 18 U.S.C. § 3553(a), see United States v. Martinez-Barragan, 545 F.3d 894, 904-05 (10th Cir. 2008), the Court also believes the sentence is reasonable. Finally, but perhaps most importantly,

the Court concludes that the 87-month sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in the Sentencing Reform Act.

**IT IS ORDERED** that Gonzales' objections to the PSR are sustained in part and overruled in part. The Court sustains Gonzales' objection to paragraph 71 of the Original PSR, which imposed a 2-level enhancement under U.S.S.G. § 2B1.1(b)(11)(C)(i). The Court also sustains in part Gonzales' eighth objection -- to paragraph 136 of the PSR -- to the extent that it varies from the Guidelines. The Court overrules all other objections. The Court denies all requests for a downward departure. The Court will vary, but not as much as Gonzales requested. The Court sentences Defendant Jasonn Gonzales to 111-months imprisonment to be followed by three years of supervised release, and orders that Gonzales pay restitution in the amount of $804,735.73, and a special assessment of $100.00 for each count of conviction, for a total of $600.00.

_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Damon P. Martinez
   United States Attorney
Tara C. Neda
Stephen R. Kotz
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Brian A. Pori
   Federal Public Defender
Albuquerque, New Mexico

   *Attorney for the Defendant*